THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JEROME J. JENDRAS, Defendant-Appellant.

First District (4th Division) No. 1—89—3142

Opinion filed June 20, 1991.

Steven J. Rosenberg, P.C., of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William P. Pistorius, and Steven M. Klaczynski, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Jerome J. Jendras, appeals from his conviction of aggravated criminal sexual abuse, contending that he was not proved guilty beyond a reasonable doubt and that he did not receive a fair trial.

Defendant was sentenced to two years of probation. He contends that the trial court erroneously admitted evidence of other incidents of sexual misconduct he had allegedly committed 9 to 15 years prior to the incident for which he was tried. He further contends that the prosecutor's conduct and remarks throughout the trial were grossly improper and prejudicial.

For the reasons that follow, we affirm.

## BACKGROUND

Defendant, who taught classes at St. Lamberts, in Skokie, Illinois, was indicted for aggravated criminal sexual abuse in October 1989. The complaining witness, M.T., testified at trial that in October 1987 he was a seventh grader and defendant was his English teacher. M.T. was an average student and defendant was a "very strict" teacher. On occasion, M.T. had to stay after school for not completing his homework.

On one such occasion, M.T. and defendant talked about going swimming. On October 10, 1987, M.T. (with his mother's permission) went over to defendant's apartment in Chicago and the two of them went swimming in the pool at defendant's apartment. They also used the sauna. Defendant gave him a swim suit, a pair of sweat pants and a pair of biking shorts. After leaving the pool, they went back to defendant's apartment. According to M.T., they discussed body building and working out. M.T. saw a weight bench in the living room and did some bench presses while defendant spotted for him.

M.T. testified that while he was doing leg curls, defendant grabbed his thighs and started to massage them. M.T. said that defendant also massaged his buttocks.

Defendant then said it was time for a break and rubbed baby oil on M.T.'s body, except for the portion covered by the swim suit. M.T. asked why he did that but defendant did not answer. M.T. took a shower to wash off the oil and then had a snack with defendant. According to M.T., during another workout on the bench, defendant touched him on the buttocks and penis through his clothes. M.T. testified that he never told defendant to stop because he was afraid.

M.T. further testified that defendant took him into the bedroom and measured his chest, biceps, waist, neck, and thighs while M.T. was in his swim suit. Then he pulled down M.T.'s suit to measure his buttocks.

M.T. testified that the two of them then went to the living room and watched a video tape about a body building contest. M.T. said that defendant started massaging his legs and buttocks, finally pulling down M.T.'s swim trunks and rubbing his genitals. M.T. testified that the fondling continued for a few minutes and then M.T. said he had to go home.

He did not tell his mother or brother when he got home because he was afraid they would make fun of him. His parents were divorced.

Following that incident, M.T. stayed after school 10 or 11 times because he did not do his homework. He testified that some of these times defendant would touch him while the door to the classroom was closed and the two were alone. Defendant would stop, however, when M.T. said that he had to go. On the last occasion that defendant touched him, they were in the corner of the room and someone tried to open the door, which was normally locked. Defendant went to open the door and spoke briefly to M.T.'s homeroom teacher, Ron Miller.

Later in the semester, defendant stopped teaching classes. M.T. did not say anything to the police when he found out that they were investigating defendant. When he initially met with police, he did not tell them anything because he was embarrassed and scared. Later, when an officer visited his home, M.T. revealed the sexual abuse.

The next two witnesses were brothers, E.N. and D.N. Their proposed testimony, concerning defendant's other alleged acts of sexual misconduct, was the subject of defendant's pretrial motion *in limine*. The trial court, sitting without a jury, denied the motion and allowed the testimony to be admitted.

E.N. testified that, some 16 years before the trial, he was an eighth grader at the school. His parents were going through a divorce. His mother agreed to let him spend the day with defendant one day in 1973. At defendant's apartment, E.N. talked about the divorce and defendant gave him a book. Defendant invited him to swim and lent him a swim suit. They swam around for awhile and E.N. testified that he felt defendant's hand touch him as E.N. swam by. When E.N. stopped and stood up, defendant pulled back his trunks and touched his penis. E.N. stopped him and said he did not want to swim anymore. Defendant then asked him to go to the sauna and he did.

In the sauna, according to E.N., defendant touched his knee and thigh and then his penis, on the outside of the swim trunks. When defendant put his hand inside E.N.'s trunks, E.N. pushed him away. They dressed, ate waffles, and the defendant took E.N. home.

On cross-examination, E.N. admitted that he did not tell police about the 1973 incident until 1988, in the course of the investigation leading to the pending charge. Defense counsel asked if E.N. was homosexual and if he had a "crush" on defendant. E.N. denied this and also denied that he had invited defendant to see some of the theatrical shows he was in. E.N also denied asking defendant to pay him $5,000 in exchange for not telling the police that defendant had abused him in 1973.

E.N. also testified that in a 1980 graduation party for his brother D.N., defendant and another man came to the party. Two or three weeks later, defendant and the other man took E.N. to a gay and lesbian parade. According to E.N., defendant tried to kiss him on the mouth. He denied that he had gone with defendant and the other man in 1980 because he wanted to establish a homosexual relationship with defendant. E.N. admitted talking to defendant several times in 1988 but said he had not talked to anyone about the incident before 1988 because he was embarrassed.

D.N., the younger brother of E.N., next testified that in 1980 he was 13 years old, an eighth grader. Defendant was his homeroom teacher. D.N. asked defendant to accompany him to a White Sox game because he looked up to him as a role model. Defendant picked him up and drove to the game. Then they went by defendant's apartment and went swimming.

While in the pool, defendant took D.N. to the deep end to show him how to swim. When the water was about chin high, D.N. felt defendant's arm rubbing his genital area. D.N. stated that he could not swim and was trying to protect his "manhood" so he became panicky. He got back to the shallow end and asked to go home. Defendant drove him home.

D.N. further testified that in January or February 1982, he saw defendant's car at a school basketball game, took a bottle of mustard, and wrote "fag" on the windshield, in retaliation for the 1980 incident.

D.N. stated that his older brother never told him that he had been molested by defendant, nor did he warn him about it. D.N. said that he did not tell anyone what had happened in defendant's apartment until eight years later, when he told E.N.

The State's next witness, Ronald Miller, testified that he was an assistant principal and eighth-grade teacher. In January 1988, he went to defendant's classroom between 4 and 4:15 to ask him a question. The door was locked and Miller tried to see into the window on the door. He said he observed defendant and M.T. in the corner of the room, facing each other with two desks put together. The lights were off in the room. He did not see any contact between the two. Defendant opened the door and answered Miller's question.

Miller testified that M.T. appeared a "little sheepish." He thought it a little unusual that defendant's door was locked.

For the defense, eight character witnesses testified, along with defendant and a police detective, Kruszyanski. The detective testified that although he interviewed D.N. before trial he never made a report of the interview. He admitted that his police reports did not contain

every detail of his interview of M.T. and did not give details about sexual contact between E.N. and defendant in the sauna at defendant's apartment in 1973. Nor did the reports mention that defendant tried to kiss E.N. in 1980. Kruszyanski further admitted that his reports did not mention that defendant had fondled M.T. He explained that the reports were just summaries of what witnesses told him, not verbatim reports.

Defendant testified that he was 47 years old and had lived in the same Chicago apartment for 16 years. He has two master's degrees, in education and theology. After the accusations of sexual misconduct came to light, he was terminated by the Archdiocese as a teacher. At the time of trial he was earning a living by delivering packages for a private delivery service. Before his termination he had been a teacher for 19 years.

When he started teaching at St. Lamberts in 1973, discipline was lax and he introduced rules of conduct for his students. He posted his home phone number on the bulletin board. He required students to knock on the door before entering, and he kept it locked from the outside. This procedure stopped students from entering without permission and safeguarded charitable donations he kept in the room that were to be given to religious missions. He kept the room locked while the school was in church, and he gave his keys to a student representative to open the classroom and put the lights on for classes.

Defendant testified that during his 15 years at St. Lamberts he had taken students on approximately 100 field trips. He gave the children birthday and Christmas gifts and sometimes allowed students to use his apartment as a shelter when they suffered such severe problems as addiction to drugs or alcohol, or if a young girl was seeking an abortion or a child was being battered by abusive adults. Defendant received many teaching awards over the years. He also was in the Army Reserve and had become a colonel at the time he was discharged because of the criminal charges.

In September 1987, M.T., one of his seventh-grade students, complained to defendant about his small physique. They discussed body-strengthening exercises. Defendant denied ever fondling M.T. He testified that on October 7, 1987, M.T. asked if he could come to defendant's apartment so that defendant could teach him how to work out. On October 18, 1987, defendant showed M.T. the weights he had in the apartment. Then they went swimming, after which they returned to the apartment to work out. Defendant said he showed M.T. how to do leg curls and lifts. He denied touching M.T.'s genitals at any time. He did not show M.T. magazines or tapes of naked men, but he did show him

workout magazines. He denied putting baby oil on M.T., pulling down his swim trunks, or measuring his naked buttocks.

Defendant said that in November, M.T. saw a picture of a wrestler in a magazine and asked defendant why the wrestler's body was so shiny. Defendant told him that they used oil. The next day M.T. said he had put oil all over his body.

Defendant also testified that his building has 102 units and that the entrance to the pool is on the first floor, with large windows that provide a clear view into the pool by anyone walking outside.

Defendant testified that he first met E.N. when defendant started teaching in September 1973. E.N. was in the graduating class of 1974. The members of that class signed defendant's autograph book. Defendant identified E.N.'s entry, which was dated May 6, 1974, shortly after the date on which E.N. claimed at trial was the date defendant had fondled him. The entry praised defendant as a "great teacher" and expressed appreciation for all the help defendant had given to him, going on at some length.

Defendant testified that E.N. had come to his apartment on May 4, 1974, at the suggestion of E.N.'s mother, who told defendant that E.N. was having problems over the divorce of his parents. E.N. asked defendant at the apartment whether "gays go to hell." They did not go swimming, defendant did not give him a suit to wear, they did not use the sauna and defendant never fondled E.N. Defendant also denied that he told E.N. he looked good in the pants he was wearing at D.N.'s graduation party. He denied trying to kiss E.N. on the beach in 1982, although he said the two did meet in 1982 and E.N. became emotional and cried over problems with his parents.

Defendant further testified that beginning on June 18, 1988, E.N. telephoned him to ridicule him and say he was going to hell. He called again to set up a meeting. In August, when they met, defendant stated that E.N. demanded $5,000 or else he would go to the police and tell them the defendant did the same things to him as defendant was accused of doing to M.T. Defendant said he talked to the FBI after that and the calls stopped.

Defendant testified that he knew D.N. from the class of 1980 but he never went swimming with him or invited him to use the sauna. He denied going to a White Sox game with him and denied ever seeing "fag" written on his car in mustard.

On cross-examination over defense objections, the State asked a series of questions regarding the types of sex education lectures he gave in class; whether he ever showed movies about oral and anal sex; and whether he asked his students to raise their hands if they ever mastur-

bated. Defendant admitted having responsibility for sex education but denied that he presented it in the manner suggested by the State's questions. He also denied asking another student, B.B., how big his penis was, and, in fact, the trial court eventually struck the entire testimony of B.B., who testified in rebuttal on that and other points, such as defendant's suspected homosexuality.

The State questioned defendant about his relationship with a certain man and whether they lived together. The State asked if he and the other man had attended a gay and lesbian parade.

The State also asked defendant if God forgave him his sins, after which the State asked another series of questions regarding the topics discussed in his theology. The State asked whether defendant discussed bestiality, homosexuals and masturbation. The prosecutor asked whether, when defendant taught, he wore "very tight pants and shirts."

In rebuttal, the State called a 17-year-old female, G.K., a former student of defendant's and neighbor of D.N.'s She testified over objection that defendant had a reputation among the students for being gay. That remark was stricken. The prosecutor stated that the issue of defendant's homosexuality went "right to the root of his moral character."

M.T's mother testified that she noticed that after M.T.'s visit at defendant's apartment, M.T. had a bathing suit, sweat pants, and biker shorts which she had never seen before.

The trial court found defendant guilty. During the sentencing phase, the court considered approximately 85 letters from defendant's former students, military colleagues, family, and friends. These letters expressed the highest regard for defendant's character and conduct. The trial court sentenced defendant to two years of probation, conditioned upon his getting psychological counselling.

Opinion

Defendant contends that he was denied a fair trial because of prosecutorial misconduct and the improper admission of "other crimes" evidence against him. He also asserts that he was not proved guilty beyond a reasonable doubt of the charge.

I

■ On the issue of reasonable doubt, the State argues that this court has retreated from the requirement that the victim's testimony, in sexual abuse cases, be "clear and convincing" or "substantially corroborated" to prove defendant guilty beyond a reasonable doubt. (*People v. Byrd* (1990), 206 Ill. App. 3d 996, 1006, 556 N.E.2d 176, 182, *appeal*

*denied* (1991), 137 Ill. 2d 667; *People v. Casiano* (1991), 212 Ill. App. 3d 680.) The standard of proof here, as in any case, requires the State to prove that the accused committed the offense beyond a reasonable doubt, whether the evidence is direct or circumstantial. We do not find it productive to engage in a semantic battle over the quality or quantity of evidence required to meet that standard. We are aware of the cases in which the sentiment is expressed that claims of sexual abuse are easy to make, hard to prove, and harder still for a defendant to defeat. (See, *e.g., People v. Findlay* (1988), 177 Ill. App. 3d 903, 532 N.E.2d 1035, *appeal denied* (1989), 125 Ill. 2d 569, 537 N.E.2d 814, quoting *People v. Nunes* (1964), 30 Ill. 2d 143, 146, 195 N.E.2d 706, 707, but *cf. People v. Meador* (1991), 210 Ill. App. 3d 829, 568 N.E.2d 1386 (rejecting double standard).) We do not necessarily agree, however, that "more" or "better" evidence is required in sexual abuse cases than in any others, since it is doubtful that any one-on-one crime could be established without either the clear and convincing testimony of the victim or independent corroboration. If the complaining witness' testimony is vague and unconvincing or uncorroborated, the defendant's denial of any crime should be given the benefit of the doubt. We therefore decline to pronounce any change in or weakening of the standard of proof in sex abuse cases, which we find to be the same as in any other case.

It is true, however, that sexual abuse cases pose troubling questions for trial judges who must decide who is telling the truth. In the pending case, the trial judge expressly noted that she has seen examples of possibly fictitious accusations of sex abuse, both on the bench and in her practice as a defense lawyer, and "for that reason [she] look[s] at cases of this type with an extremely skeptical eye." She went on to find this defendant guilty beyond a reasonable doubt, however, even apart from the testimony of E.N. and D.N.

 We believe that this court must view the testimony of M.T. and the trial court's findings on credibility as binding on the issue of whether the State carried its burden of proving the charge beyond a reasonable doubt. As will be discussed below, we have reservations about the testimony of E.N. and D.N., but the testimony of M.T. and the trial court's findings as to M.T.'s credibility are not, in our opinion, so improbable or unsatisfactory as to create a reasonable doubt of guilt. See *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

The trial judge commented that there were "many aspects of [defendant's] teaching that [she] found particularly commendable" but that it was not her role to judge his teaching skills or determine how and what he should teach. She found as follows:

"Two things have really been proved in this case. The first thing is that the defendant is a respected teacher. He has contributed much to his school, his church, his community, his country, through his military service.

The other thing that's been proved is that the defendant sexually abused [M.T.] *I found the testimony of [M.T.] standing alone sufficient to support a finding of guilty, found it clear, convincing, utterly credible. He was not materially impeached in any way.*" (Emphasis added.)

The judge found "no hostility evident in his testimony" and nothing to indicate any reason why M.T. would be lying. Her additional comments indicate a commonsense realization that kids like attention but that it was doubtful that children aged 12 and 13 years would want their involvement in incidents of sexual conduct to be brought to the public and the press. The court also found "most damning" the testimony of Mr. Miller, "who corroborated the testimony of [M.T]" by providing substantiation of the incident in which defendant and M.T. were sitting alone in the locked classroom. The judge noted a conflict in defendant's testimony about the circumstances in which the door was locked, in light of Miller's testimony that it was not always closed and locked when Miller came to the door.

We do not find it unusual that M.T. was silent about the incident. He was 12 years old at the time and looked up to his teacher. Shame and confusion might have kept him from confiding to anyone, including the police officers who initially questioned him. Soon after, however, he did report the abuse when the officer came to his house. See, *e.g., People v. Rassmussen* (1986), 143 Ill. App. 3d 11, 492 N.E.2d 612 (affirming conviction of child abuse where victim failed to make a prompt complaint and initially failed to tell the police when they questioned him); *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 83, 502 N.E.2d 1263, 1272, (Court should not "be unmindful that the shame, guilt, or embarrassment which a child suffers when victimized in the manner proved here excuses a delay in the minor's disclosure of such incidents").

We conclude that defendant's conviction is supported by evidence of his guilt beyond a reasonable doubt.

## II

The alleged trial errors are more problematical. The State normally is barred from presenting evidence tending to show that defendant has committed other crimes or bad acts, the reason being to prevent the fact finder from deciding the accused is guilty of the crime charged because of his or her "propensity" to commit such crimes. (See, *e.g.,*

*People v. Rose* (1990), 198 Ill. App. 3d 1, 555 N.E.2d 414.) Well-recognized exceptions to the general rule permit such evidence to show "intent, motive, identity, absence of mistake, knowledge, common design, scheme or plan, or *modus operandi.*" *People v. Esterline* (1987), 159 Ill. App. 3d 164, 168, 512 N.E.2d 358, 361, *appeal denied* (1987), 117 Ill. 2d 548, 517 N.E.2d 1090.

■ ■ The exception the State relies on in the pending case is that of *modus operandi.* In order to submit evidence under this exception the State must show that " 'both crimes share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant.' " (*Esterline,* 159 Ill. App. 3d at 169-70, 512 N.E.2d at 362, quoting *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486-87, 485 N.E.2d 1292.) Defendant argues that in this case, the testimony of E.N. and D.N. is not sufficiently similar to that of M.T.'s description of the acts of defendant to come within this exception to the general rule. Defendant claims that the only similarities between the three incidents of abuse are that they took place at defendant's apartment. The State views the issue differently, noting that all three victims were males in the seventh or eighth grade who had defendant as their teacher and who went alone to his apartment, where they were provided swimming suits and invited to swim and use the sauna. Their parents were living apart and they were living with their mothers. In all three cases, the acts of touching and fondling were similar, and the defendant ceased when the boys said they had to leave.

We agree with the State that the three incidents were similar enough to constitute a pattern that fits within the *modus operandi* concept (see, *e.g., People v. Taylor* (1987), 153 Ill. App. 3d 710, 506 N.E.2d 321, *appeal denied* (1987), 116 Ill. 2d 573, 515 N.E.2d 123; *People v. Williams* (1989), 185 Ill. App. 3d 840, 541 N.E.2d 1175, *appeal denied* (1989), 127 Ill. 2d 639, 545 N.E.2d 129). We believe that since the State normally is allowed to present whatever evidence is relevant to the issues, this evidence is admissible under the *modus operandi* exception to the general bar against other crimes evidence. Nevertheless, the prejudicial impact of such testimony is so great that we must consider whether admission of this evidence was an abuse of discretion under the circumstances.

We are concerned about the remoteness in time of the brothers' testimony. In our opinion, the testimony of E.N., in particular, is open to challenge based on the time that elapsed from the time the alleged sexual abuse occurred and the time E.N. came forward, at age 29. Moreover, the evidence indicated that he and defendant had maintained some contact over the years, on at least one or two occasions when E.N. was

an adult. Based on this and other evidence, the defense attempted to demonstrate that E.N.'s motives in testifying were suspect. Then, too, E.N. apparently did not warn his younger brother, D.N., that defendant might attempt to molest him. Finally, E.N.'s entry in defendant's autograph book, made a few days after defendant allegedly fondled E.N., casts some doubt on the story that came out 15 years later. E.N. praised defendant as a great teacher and thanked him for his help at some length, which does not appear consistent with sexual trauma.

On the other hand, it is not the role of this court to decide the credibility of witnesses. The trial judge did not find any evidence that E.N. was "a jilted lover," despite the defense attempts to suggest that scenario. The judge also found that the autograph book did not affect E.N.'s credibility because he was 13 at the time and was writing something that would be viewed by his whole class and it was to a teacher that he cared about. The judge noted that when authority figures or role models sexually abuse children, the victims do not necessarily react with anger and hostility, at least until they grow older and realize what happened.

■ A trial court's decision to admit other crimes evidence under *modus operandi* or any other exception to the general bar is a judgment call tied to the particular circumstances of the case. When the evidence is also remote in time from the occurrence that is being tried, the court may bar admission of the evidence if its relevance is substantially undermined thereby. (See, *e.g., People v. Tennin* (1987), 162 Ill. App. 3d 520, 524, 515 N.E.2d 1056, 1059; *People v. Mikyska* (1989), 179 Ill. App. 3d 795, 803, 534 N.E.2d 1348.) While the admission of such evidence may lead to reversible error in some cases, we believe that in general, the issue of remoteness should go to the weight of the evidence rather than its admissibility. See *People v. McMillan* (1980), 86 Ill. App. 3d 208, 407 N.E.2d 207 (10-year gap between incident of prior sexual misconduct and offense charged did not preclude admission of evidence).

■ Accordingly, we resolve this close question of the admissibility of the evidence in favor of the trial court's discretion, particularly since this was a bench trial and the trial judge's comments reflect her considered efforts to weigh the evidence even apart from the testimony of E.N. and D.N. In that regard, even if we were to find that the admission of the evidence was error, we would find it to be harmless error in light of M.T.'s clear and convincing evidence of defendant's attack. Because M.T.'s testimony was not inherently incredible, nor materially impeached, the outcome of defendant's trial would not have differed had the court refused to admit the testimony of the two brothers.

## III

Defendant's final contention is that he was denied a fair trial because of the prosecutors' disparaging remarks that attacked defendant's perceived lifestyle. The first incident defendant cites occurred in court, in the presence of the judge. The lead prosecutor for the State turned to defendant, gestured toward the courtroom door and said, "Homosexuals first."

Such a comment is certainly inappropriate courtroom behavior and the State's brief concedes that it was "ill-advised." The tone of the remark reflects poorly on the speaker, an officer of the court. This prosecutor also asked defendant if he wore "very tight pants and shirts" while teaching and asked if "God [forgave him his] sins." Apart from their offensive nature, the relevance of such questions is clearly lacking because defendant was not on trial for his sexual preference, his dress, or whether his lifestyle fit within his theological learnings. The trial judge demonstrated her awareness of what matters were irrelevant by her comments and by cutting off questions that were designed to create an issue of homosexuality relating to defendant's character. When the prosecutor argued that homosexuality "goes right to the root of his moral character," the trial judge said, succinctly, "Homosexuality is not against the law. Who cares?"

The record reveals the ineffectiveness of the prosecutor's remarks and improper questions. The court expressly disregarded those "elements of the defendant's lifestyle [that] were injected into the case." As the judge found, "His lifestyle is totally irrelevant to this case. It has nothing to do with the facts here."

We conclude that the prosecutor's unseemly remarks did not sway the trial court and therefore did not affect the outcome of the trial.

We affirm defendant's conviction and sentence of probation.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.