THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM ALBRECHT, Defendant-Appellant.

First District (3rd Division)   No. 1—91—0994

Opinion filed February 15, 1995.—Rehearing denied April 25, 1995.—Modified opinion filed April 26, 1995.

Michael Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Matthew J. McQuaid, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant, William Albrecht, was convicted of three counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(d) (now 720 ILCS 5/12—16(d) (West 1992))) and two counts of criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—15(b) (now 720 ILCS 5/12—15 (West 1992))), involving three minors, D.C., E.K., and P.O. Defendant was sentenced to six years' imprisonment for the aggravated criminal sexual abuse convictions and 364 days for each of the criminal sexual abuse convictions with the sentences to run concurrently.

On appeal, defendant asserts that (1) he did not validly waive his right to counsel because the police did not inform him that a retained attorney was present and requesting to speak with him; (2) the State improperly presented extensive evidence of other crimes or misconduct; and (3) the convictions for criminal sexual abuse of D.C. should be reversed because the indictment did not allege that the sexual acts occurred within the statute of limitations.

Prior to trial, defendant filed motions to suppress his statements and evidence, which were denied.

Wheeling police officer Robert MacDonald testified that he and Officer Jerome Hermes arrested defendant at his home on May 3, 1988, pursuant to a warrant. According to MacDonald, he did not hear defendant tell anyone to call an attorney, but defendant did tell his son to call Mrs. Albrecht at work.

At the police station, MacDonald advised defendant of his *Mi-*

*randa* rights. Defendant stated that he understood and signed an advisement of rights form. MacDonald left the interrogation room at 4:30 p.m, but returned at 5:40 p.m. to give Detective William Hubner a note informing him that an attorney was present at the station and was asking to see defendant. MacDonald testified that the officers did not want defendant to know that an attorney was at the station because defendant had not asked for one. MacDonald then saw Hubner and defendant come from the interrogation room. When Hubner asked defendant whether he wanted to speak to an attorney, defendant declined. MacDonald did not hear anyone else say anything to defendant at that time.

Detective Hubner's testimony regarding events at the police station was essentially the same as MacDonald's. In addition, Hubner testified that he spoke with defendant until 6:15 p.m., at which time he introduced Assistant State's Attorney Diane Romza to defendant and left the interrogation room. Around 7:30 p.m., Hubner returned to the interrogation room at Romza's request to witness defendant's signature on the typewritten statement. Around 8:30 p.m., defendant signed a consent to search form.

Assistant State's Attorney Romza testified that she went to the Wheeling police station at 4:45 p.m. where she saw defendant speaking to Officers Hines and Hubner in an interrogation room. At that time, she learned that defendant had waived his rights. Around 5:30 or 5:45 p.m., Romza received a telephone call from attorney Michael Norris, who said he represented defendant and asked whether any questioning had begun. Romza told Norris that defendant had waived his rights, had not asked for an attorney, and was being questioned by the Wheeling police. Romza also told Norris that she would tell defendant that Norris had called.

After the phone call, Romza informed the police that an attorney had called for defendant. Romza then saw an officer take a note to Hubner in the interrogation room. When Hubner and defendant came out of the room, Hubner asked defendant if he wanted to speak with an attorney. Defendant said that he did not want an attorney and wanted to continue to speak with Hubner. According to Romza, she then told defendant that an attorney had called and asked if defendant wanted to speak with him.

Later, Romza spoke with defendant alone in the interrogation room. After showing defendant the advisement of rights form he had signed earlier and advising him of his *Miranda* rights, Romza spoke with him for 25 to 30 minutes. Defendant agreed to have their conversation typed in the form of a statement. Around 7:30 p.m., defendant was given the typed statement. After reading a paragraph to

prove that he could read, defendant signed the statement without making any corrections or changes. Defendant then signed a consent form to search his house.

Police officer Kuzynowski saw Hubner bring defendant out of the interrogation room at 5:30 p.m. and ask whether he understood his rights and wanted an attorney present during the interview. Defendant responded that he understood his rights and wanted to continue speaking with Hubner. Kuzynowski did not hear anyone tell defendant that there was an attorney present who wanted to speak with him.

Ten or fifteen minutes later, Kuzynowski spoke to Norris and defendant's wife in the police station lobby. Kuzynowski told Norris that defendant voluntarily waived his rights, did not say he was represented by an attorney, and did not ask for an attorney. Since defendant never requested an attorney, Norris was not allowed to see him.

Mary Albrecht testified that she called the Wheeling police department around 4 p.m. After Officer Kuzynowski told her that her husband was under arrest, she called attorney Norris, then went to the police station. When she arrived around 4:30 p.m. and the officers would not let her see her husband, Mary informed them that she had contacted an attorney who was coming to the station. At 5:45 p.m., Norris arrived at the police station, but Kuzynowski would not allow him to see defendant.

Defendant testified that he was arrested at his home at 3:30 p.m. on May 3, 1988. After the police officers refused to let him call his attorney, he told his son to call Norris and Mrs. Albrecht to tell them that he was under arrest. At the police station, defendant was informed of his rights. He understood those rights, but told Hubner and MacDonald that he wanted to speak to an attorney. He was not allowed to call Norris.

The trial court found that defendant did not tell his son to call attorney Norris, but that defendant's wife, Mary Albrecht, had called Norris. The trial court also found that defendant had waived his rights, had never asked to consult an attorney during the interview process, and had made a knowing and intelligent waiver of his right to counsel. In addition, the trial court found that attorney Norris was present at the police station, but defendant was not informed of his presence. It was error to deny defendant's motion to suppress.

At trial, Officer MacDonald testified to essentially the same facts as during the pretrial hearing. In addition, MacDonald stated that during the interview with Hubner, defendant said that he loved the boys, knew that he had a problem, and knew it was getting out of

control. Defendant stated that he had had this problem before and received counseling without success. MacDonald also testified that when Romza interviewed defendant, he admitted he knew he was a pedophile and that he had had sexual conduct with the four boys.

MacDonald further testified that after defendant signed a consent to search form, he and several other police officers searched defendant's home. They found a thermometer, blood pressure device, package of electrodes, electric wires, and scrub gowns.

Romza testified that she asked defendant if he knew what a pedophile was and he indicated that a pedophile is a person who does sexual things to a child and does not stop. When she asked defendant if he had done sexual things with children, he admitted that he had.

According to Romza, defendant stated that he met P.O. through his children. In December 1987, defendant asked P.O. to come to his bedroom where he told P.O. he was conducting a hospital experiment. Defendant told P.O. to remove his clothes and then masturbated him. After that, defendant put a thermometer into P.O.'s anus. Defendant admitted that he had masturbated P.O. on three other occasions.

Defendant also told Romza that during the summer of 1987, he masturbated R.G. once and E.K. twice, telling them that it was part of a hospital experiment. Defendant said that he did the same thing to R.B. in 1988. Romza stated that defendant gave a written statement, which contained essentially the same facts as in the oral statements described above.

Over defense counsel's objection, Lisa Pinto, a Ph.D. in clinical psychology, testified as an expert witness. She testified that sexual abuse results in anti-social and self-destructive behavior by the victim. Pinto stated that she treated P.O. for six months for the effects of long-term sexual abuse. At that time, P.O. was withdrawn, tearful, and fearful of contact with people. He had self-inflicted razor marks on his chest, was anti-social, and was involved in a gang and vandalism. His family relationships had deteriorated and he had threatened to hurt people. According to Pinto, this was consistent with post-traumatic stress syndrome.

Next, D.C. testified that he met defendant's son in December 1986 when D.C. was 14 years old. D.C. often went to defendant's home after school to play computer games, including sexual fantasy games. In January 1987, D.C. was at the Albrecht home playing computer games when defendant asked D.C. if he would be interested in working on a computer program that involved a medical data base. Defendant told D.C. that he would get weekly checkups for which he would get paid. Defendant told D.C. not to tell anyone about the project. When D.C. returned later that evening, he agreed to participate.

During the first week of February 1987, defendant took D.C. to a bedroom where defendant had D.C. remove his shirt. Defendant checked D.C.'s muscles, then made notes. D.C. then lowered his pants halfway and pulled down the front of his underwear. Defendant put his hand into D.C.'s underwear and felt his penis and testicles with three fingers to "see if everything was working properly." Again, defendant made notes. The entire examination took about 20 minutes, and D.C. received $4 or $5.

A couple of weeks later, defendant performed a second "examination," which was like the first one. When defendant explained that the rest of the program would involve getting an erection and holding it while he checked everything, D.C. said that he wanted out because he felt uncomfortable. Defendant agreed. A few days later, defendant gave D.C. money for the second examination.

In addition to these sessions, D.C. testified that defendant conducted initiations to bring other people into the Albrecht extended family. D.C.'s initiation occurred after school in May or June of 1987. Defendant tackled D.C., held him to the floor, and put ice cubes down the front of his pants.

D.C. stated that he saw about 12 initiations at the Albrecht house. He recalled P.O.'s initiation in October 1987, which was done with the assistance of D.C. and two of his friends, who held P.O. down while defendant stuffed the ice cubes.

Next was B.O.'s testimony, to which defendant objected on the basis that it was inadmissible prior bad acts being used to show a propensity to commit the crimes charged. The State argued that the testimony was being presented to show common scheme, design, plan, absence of mistake, and intent.

B.O. testified that he was 14 years old when he became friendly with defendant's son. During January of 1986 or 1987, B.O. had a conversation with defendant that began in the Albrechts' living room and continued in a bedroom. Defendant put his arm around B.O. and began stroking himself. He asked if he could put a needle in B.O.'s penis to see if the blood turned a different color and talked about initiating B.O. into the family by placing ice cubes in his pants. Defendant said he would pay B.O. and that B.O. should consider whether he wanted to participate. After the conversation, B.O. did not return to the Albrecht home.

Next, P.O. testified that he met the Albrecht family during the summer of 1986, when he was 13 years old. He was at their home almost every day playing computer games, which included adult games that defendant taught him. About a month after P.O. met the Albrechts, defendant asked if he would be interested in working on a

computer project for which P.O. would be paid $2,000. Five weeks later, they started the project. Defendant explained that he was going to take measurements of P.O.'s body, take his temperature, take a sperm sample, and do a drug screen.

Defense counsel objected that this testimony was prior acts of misconduct not charged in the indictments and which only served to show a propensity to commit crime. The State argued that it went to the lack of mistake, *modus operandi,* and common scheme. The trial court overruled the objection on the basis that the evidence went to *modus operandi.*

P.O. stated that the project with defendant began in the middle of the summer and lasted until just before Christmas. There were approximately 10 sessions, all occurring in the Albrecht home when defendant and P.O. were alone. Defendant took measurements of P.O.'s body, his blood pressure, and his temperature by way of his rectum. The examination bothered P.O., but he wanted the $2,000.

Three weeks before Christmas, defendant masturbated P.O. in order to get a sperm sample. P.O. thought this was unusual, but was not very upset. At the end of that session, P.O. got dressed and went downstairs where other people were playing computer games. Although P.O. was traumatized, he stayed and played computer games for a half hour.

Shortly after Christmas in 1986, P.O. was sick of the project, but went to the Albrechts' home because he was dating defendant's 14-year-old daughter, Colleen. In the spring of 1987, defendant brought out tarot cards and discussed witchcraft with P.O. Because P.O. wanted to learn about witchcraft, defendant told him that he had to prove he was loyal by wearing a ring around his testicles for 24 hours. Defendant did not have a ring so he used a paper clip. P.O. did not wear it for the entire 24 hours because it hurt.

In December 1987, defendant approached P.O. about participating in a project where defendant could turn P.O. into a super stud and in which 10 other children across the country were participating. P.O. agreed to participate. On December 17, 1987, defendant had P.O. remove all his clothes and opened the windows to get P.O.'s temperature in cold weather. Defendant took P.O.'s temperature by way of his rectum, then masturbated him to get a sperm sample.

During this second project, P.O. met with defendant four times. Defendant felt P.O.'s testicles five times to check for cancer and took a drug scan by putting a Q-tip up his penis. P.O. said that defendant was grunting and moaning while he conducted the project. During the last session, defendant shaved P.O.'s pubic hair and gave him shock treatments with wires. After defendant shocked P.O. two or

three times, he turned up the intensity of the shocks. P.O. asked him to stop, but he did not, so P.O. ripped off the electrodes and left.

During April 1988, P.O. stopped dating Colleen. Although defendant had broken up the relationship, P.O. denied that he went to the police to hurt defendant. P.O. stated that he joined a gang, started using drugs, and began having trouble with the police after he participated in defendant's experiments. During those two years, P.O. was initiated into the family five times by having ice cubes put down his underwear. In 1989, P.O. was admitted to the hospital.

Next, E.K. testified that in 1988 when he was 13 or 14 years old, he met the Albrecht family through his best friend. He went to their house every day to watch television or play video games. At the end of March or beginning of April 1988, E.K. was initiated into the family.

During April 1988, E.K. had a conversation with defendant in the Albrecht kitchen. Defendant asked E.K. if he wanted to participate in a computer program defendant was putting together for the hospital. A week later, defendant told E.K. that the project would involve taking a physical and obtaining a sperm sample. Defendant said he would pay E.K. $10 for each portion of the program, and E.K. agreed to participate.

A week later, E.K. went to defendant's bedroom while other people were downstairs. After defendant locked the bedroom door, he had E.K. remove all his clothes and lie on the floor while defendant squeezed E.K.'s muscles. Defendant also took E.K.'s temperature and blood pressure, then checked for cancer by lifting E.K.'s penis and touching his testicles. After the examination, E.K. got dressed and went downstairs to play with the computer. E.K. stated that he did not think this examination was unusual because he trusted defendant. Defendant did not pay E.K. for that session.

In addition, four other boys testified about their experiences with defendant. At the conclusion of this testimony, defense counsel made a motion for directed verdicts on all the indictments. The trial court granted the directed verdict motion as to the charges regarding R.G. and R.B. Defendant did not testify.

After deliberations, the jury found defendant guilty of criminal sexual abuse of D.C., E.K., and P.O., and aggravated criminal sexual abuse of E.K. and P.O. Defendant was sentenced to six years' imprisonment for the aggravated criminal sexual abuse convictions and 364 days for each of the criminal sexual abuse convictions with the sentences to run concurrently.

On appeal, defendant asserts that he did not validly waive his right to counsel at the police station since the police did not inform

him that a retained attorney was present and requesting to speak with him. We agree.

In its recent decision in *People v. McCauley* (1994), 163 Ill. 2d 414, the Illinois Supreme Court ruled that there can be no knowing waiver of the right to counsel if the police withhold information from a suspect that his attorney is present and seeking to consult with him. (*McCauley*, 163 Ill. 2d at 425.) If the police do not allow an attorney to consult with an accused, they violate Illinois' constitutional guarantee against self-incrimination (Ill. Const. 1970, art. I, § 10) and due process rights (Ill. Const. 1970, art. I, § 2). It is not sufficient for authorities to merely advise a suspect of a generalized right to an attorney. *McCauley*, 163 Ill. 2d at 442.

Illinois "favor[s] a person *having* the assistance of counsel during custodial interrogation and contemplates prohibiting interference with that assistance by governmental authorities.*** [D]ue process is violated when police interfere with a suspect's right to his attorney's assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him." (Emphasis in original.) (*McCauley*, 163 Ill. 2d at 444.) By withholding information from an accused that his attorney is in the police station available to consult with him, the police conduct bears directly on the accused's right to counsel. (*McCauley*, 163 Ill. 2d at 445.) It is irrelevant whether the attorney is appointed or retained, whether the defendant or the defendant's family retains the attorney, or whether the defendant knows about the retention. *McCauley*, 163 Ill. 2d at 437-38.

■ Based on the *McCauley* decision, defendant's motion to suppress statements and evidence should have been granted because the police officers' and the assistant State's Attorney's conduct violated the Illinois constitutional guarantee against self-incrimination and due process rights.

Among the statements and evidence obtained by the State and introduced at trial from defendant was his written confession, his oral statement that he was a pedophile and that he had had sexual conduct with the named boys, and that there had been a 1973 incident. He signed a consent to search his home, where the police recovered a thermometer, blood pressure device, electrodes and other evidence.

Thus, we reverse defendant's conviction and remand the case to the trial court for a new trial.

Next, defendant asserts that he was denied his right to a fair trial because the State improperly presented extensive evidence of

other crimes or misconduct. Specifically, defendant complains of evidence presented about the ice cube initiations, his interest in witchcraft, other types of sexual conduct, and his possession of computer games of a sexual nature. Defendant argues that this evidence was either irrelevant, highly prejudicial with little or no probative value, or both.

In response, the State asserts that this evidence was admissible to show *modus operandi*. The State maintains that defendant's *modus operandi* was that (1) the sexual abuse occurred in an upstairs room in his home; (2) the sexual abuse was always pretexted under the guise of a medical computer experiment or data base; (3) three of the victims were promised remuneration for their participation; (4) defendant masturbated three of the victims; and (5) some of the victims were asked to undergo shock treatments to their pubic area. P.O. did, in fact, receive such shock treatments. The State contends that other aspects of defendant's *modus operandi* were that defendant attempted to be a father figure, provided rides to his children's friends, and sometimes gave them money. Furthermore, the State asserts that the trial court gave the jury a limiting instruction that the other crimes evidence was to be considered for intent or *modus operandi*.

While evidence of sexual misconduct with other children is admissible only if it is relevant for purposes other than showing a defendant's propensity to commit the crime charged, the evidence is admissible if it shows the defendant's *modus operandi*. (*People v. Daniels* (1988), 172 Ill. App. 3d 616, 624, 527 N.E.2d 59.) This case is similar to *People v. Jendras* (1991), 216 Ill. App. 3d 149, 159, 576 N.E.2d 229, where the pattern of the incidents constituted *modus operandi*. Although the defendant was indicted for aggravated criminal sexual abuse of only M.T., E.N. and D.N. were allowed to testify about the defendant's other bad acts. (*Jendras*, 216 Ill. App. 3d at 151-59.) All three victims were the defendant's male students who went alone to his apartment to go swimming. Their parents were separated and the victims lived with their mothers. In all three cases, the acts of touching and fondling were similar. (*Jendras*, 216 Ill. App. 3d at 159.) The court agreed that the incidents were similar enough to constitute a pattern that showed *modus operandi*. *Jendras*, 216 Ill. App. 3d at 159.

■ The evidence in this case was properly admitted as *modus operandi*. The ice cube initiations, witchcraft lessons, and computer games were admissible because they created a family atmosphere and were used to gain the victims' confidence. In addition, the evidence of other types of sexual conduct was also admissible as *modus operandi*.

■ Defendant also contends that his statements should have been redacted to eliminate any mention that he was a pedophile, had a problem with a child in 1973, and had received counseling that did not help him. We do not need to address this issue because defendant's statement will not be admissible in a new trial.

■ Finally, defendant asserts that the convictions for criminal sexual abuse of D.C. should be reversed because the indictment did not allege that the sexual acts occurred within the statute of limitations. Defendant's failure to raise this issue in his post-trial motion constituted waiver of the issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) Also, the filing of the original indictments, although dismissed, tolled the statute of limitations. Ill. Rev. Stat. 1989, ch. 38, par. 3—7(c).

Based on our determination that the cause must be remanded for a new trial, we must consider the sufficiency of the evidence in order to protect defendant's constitutional right against double jeopardy. (*People v. Reynolds* (1994), 257 Ill. App. 3d 792, 806, 629 N.E.2d 559.) Although we are not making a finding as to defendant's guilt or innocence that will be binding in a new trial, we conclude that the evidence presented at trial was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt.

Accordingly, the trial court's order denying defendant's motion to suppress statements and evidence obtained after the arrival of defendant's attorney is reversed. Defendant's convictions are also reversed and the case is remanded for a new trial and such further proceedings as the trial court shall determine. At a new trial, statements made to the police officers and assistant State's Attorney before the arrival of attorney Norris at the police station, if any, shall be admissible based upon the *McCauley* decision.

Reversed and remanded.

GREIMAN, P.J., and RIZZI, J., concur.