THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM JOE GAITHER, Defendant-Appellant.

Fifth District   No. 5—89—0783

Opinion filed December 4, 1991.

Daniel M. Kirwan and Janet L. Gandy, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles C. Roberts, State's Attorney, of Olney, for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, William Joe Gaither, was found guilty of battery in violation of section 12—3(a)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1989, ch. 38, par. 12—3(a)(1)) and was sentenced to 364 days in the county jail. In this cause defendant raises the following contentions: (1) that he was not proven guilty of battery beyond a reasonable doubt, (2) that the trial court erred in admitting evidence regarding other acts of abuse, and (3) that the penalty provided for the offense of battery as applied to this case violates the constitutional assurances of proportionate penalties and due process. We affirm.

Defendant was charged with aggravated battery of a child in violation of section 12—4.3(a) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.3(a)). The charge alleged that on March 8 or 9, 1989, defendant "lifted Kelly Gomes upside down by the leg thereby breaking both bones in the lower leg (right) of Kelly Gomes." The case went to trial on September 20 through 22, 1989. At that time, the following evidence was adduced.

The victim, Kelly Gomes, was born on August 4, 1988. Kelly's mother is Dustie Gomes. Dustie Gomes and defendant, who was not Kelly's natural father, were living together at 926 West Elm Street, Olney, on March 8 and 9. During questioning by the Olney police department, defendant told Officer Rich Chaplin that Kelly came before him as far as Dustie was concerned. However, defendant told Officer Chaplin that this did not bother him. Defendant also told Officer Chaplin that he never mistreated Kelly. Defendant was also questioned by Officer Fyffe. According to Officer Fyffe's testimony, defendant initially denied that he abused Kelly, but upon further questioning, defendant admitted that he hurt Kelly because he was angry at Kelly. He told Officer Fyffe that Kelly was not his child, but that he cared for Kelly's mother. During this questioning, defendant initially denied

ever holding Kelly suspended by his foot or feet, but later admitted to suspending Kelly in the air by his feet. Defendant stated that while doing this he had supported Kelly's head and had jerked him up and down in order to play with him. Defendant also advised Officer Fyffe that on April 20, he had picked Kelly up by the skin on his neck without supporting his body. Defendant admitted to Officer Fyffe that he had put his hand over Kelly's mouth and had pinched Kelly's nose, thereby cutting off the infant's air supply. Later, defendant denied he had ever shut off Kelly's air supply.

Sheila Linxwiler and her son, Eric Degroot, also lived at 926 West Elm with defendant, Dustie Gomes, and Kelly Gomes. The two had moved into the home on March 7, 1989. Sheila Linxwiler testified that a few days after she moved in, she saw defendant dangling Kelly by his right ankle. Sheila Linxwiler was sitting at the kitchen table with Eric and Dustie. She heard Kelly crying, and when she looked up, she saw defendant dangling Kelly by his right ankle. She also saw defendant give Kelly four or five quick jerks by the ankle. Ms. Linxwiler described Kelly's cry on this occasion as an "alarming" cry and as a "shriek." She stated that Kelly cried for approximately 10 to 15 minutes after this incident. She also testified that during the five weeks she lived at 926 West Elm, she saw defendant mistreat Kelly on other occasions. Specifically, she described at least two incidents after the dangling incident wherein she saw defendant set Kelly on either a table or on the sink and poke Kelly in the chest with his index finger. When questioned about why she failed to tell a worker for the Department of Children and Family Services (DCFS), Brad Leckey, who visited the house in late March, about any of these incidents, Sheila Linxwiler testified that she was trying to protect Dustie Gomes. She did not want DCFS to take Kelly away from Dustie.

Eric Degroot, who was 16 years old at the time of trial, moved into 926 West Elm on March 7, 1989, along with his mother, Sheila Linxwiler. He also stated that one or two days after they moved to this location, he saw defendant holding Kelly by his right leg and shaking or jerking him. Eric stated that he saw defendant shake Kelly up and down approximately 10 times, which caused Kelly to cry for a "couple" of minutes. Eric testified about other times when he saw defendant mistreat Kelly. Eric stated that he saw defendant "flip" the baby in the face hard enough to make the baby cry. On the 19th or 20th of April he heard Kelly crying, and upon checking to see why Kelly was crying, he witnessed defendant holding Kelly by the skin around his throat and shaking him. Kelly's head was going back and forth, and the infant was screaming. Sometime in April, Eric saw

defendant put his hand over Kelly's nose and mouth long enough to make Kelly gasp for air, approximately 5 to 10 seconds. He saw defendant do this about four or five times. In March, Eric saw defendant put a three- or four-inch-long syringe filled with a liquid, which at the time defendant described as "piss," into Kelly's mouth and push it down his throat. Eric admitted that he did not tell Brad Leckey from DCFS about these incidents even though Leckey questioned him concerning incidents of abuse. After Eric's direct examination, defendant made a motion for mistrial, arguing that the probative value of the testimony concerning defendant's forcing urine down Kelly's throat did not outweigh the prejudice of this testimony. Defendant's motion for mistrial was denied.

Sherry Brauer of DCFS testified about her interviews conducted on April 20 and 21, 1989, with those living at 926 West Elm. During her interviews, Ms. Brauer became concerned about Kelly's condition and took him to the emergency room. She noticed a swelling of his right extremity. On April 21, 1989, Kelly was admitted to the hospital and examined first by Dr. Rodriguez, the emergency room physician.

Dr. Rodriguez found Kelly to be withdrawn and unresponsive to stimulation. He noticed some bruises on Kelly's face and an abrasion or some discharge on the left side of Kelly's neck. Dr. Rodriguez ordered X rays of Kelly's lower extremities. The X rays showed the presence of a "green-stick" fracture on both the right tibia and right fibula located approximately one centimeter from the ankle joint. A green-stick fracture occurs in children because their bones are not yet completely developed and do not snap like the bones of an adult. Green stick refers to a piece of young wood that does not snap but rather bends and leaves a crease where the stress has been applied.

Dr. David Benson, a pediatrician, also treated Kelly. Dr. Benson noticed that both of Kelly's ankles were swollen. He confirmed a green-stick fracture, but he stated that the fracture would not be expected to come from a trauma occurring as much as six weeks earlier but rather was the result of a more recent trauma. Dr. Peter Weber, an orthopedic surgeon, reviewed Kelly's X rays. He confirmed a green-stick fracture of the distal tibia and probably fibula. Dr. Weber opined that this injury could have been the result of Kelly having been held upside down by his ankle and jerked. In Dr. Benson's opinion, the fracture occurred within one week of the time the X ray was taken.

Several witnesses testified for the defense. Dustie Gomes testified concerning the incident in question. She stated that she saw defendant hold Kelly with his hands around Kelly's ankles and behind Kelly's

neck. She did not see defendant shake Kelly. Dustie Gomes admitted she made the statements at the Olney police department that she believed defendant wanted her son dead; however, upon redirect examination, she stated that when making that statement on April 21, 1989, she believed defendant had broken Kelly's leg. Since that time, Dustie Gomes stated that she has changed her mind and no longer believes that defendant broke Kelly's leg.

Velma Zimmerle, defendant's mother, testified that her son did not mistreat Kelly. She did not see defendant poke or squeeze Kelly. However, Ms. Zimmerle admitted that she did not see defendant or Kelly after January 1989.

Defendant testified on his own behalf. He denied picking Kelly up by his ankle on March 8 or 9. During cross-examination, defendant stated that he remembered talking to Officer Fyffe on April 21 and admitting to Officer Fyffe that he had picked Kelly up by one foot and then both feet and turning him upside down in the air; however, later in the cross-examination, defendant stated that he told Officer Fyffe that he had picked Kelly up by the calves. Defendant demonstrated to the jury the way in which he had held Kelly. The record describes this demonstration as defendant having his right hand under Kelly's calves and his left hand under Kelly's back or neck area. Defendant stated that he rocked Kelly in this position. Defendant did not recall telling Officer Fyffe that his actions toward Kelly were mean rather than playful. Defendant stated he was not angry or jealous of Kelly.

Defendant's father, William Gaither, Sr., testified for his son. William Gaither, Sr., was involved in an affair with Sheila Linxwiler during March and April of 1989. When William Gaither visited the home at 926 West Elm to see Ms. Linxwiler, he never saw defendant pinching or poking Kelly.

The stipulated testimony of DCFS worker Brad Leckey was admitted, as Leckey was unavailable for trial. Leckey conducted an investigation on March 29, 1989, concerning the alleged child abuse of Kelly Gomes. At that time, Eric Degroot told Brad Leckey that no one was mean to Kelly. Leckey's records do not indicate that he observed any bruising or swelling of Kelly's right ankle.

During rebuttal, the State offered testimony of two officers from the Olney police department who had interviewed Dustie Gomes. Both officers testified that Dustie told them that both she and defendant had wished they did not have Kelly and at times wished Kelly was dead.

At the close of the evidence, defense counsel moved for directed verdict on the grounds that the State had failed to prove Kelly had suffered any physical harm. Defendant also argued that there was no evidence in the record to support the charge that defendant did anything to Kelly on March 8 or 9, 1989, the dates in the charging instrument, that would have caused great bodily harm. The court directed a verdict for defendant as to the aggravated battery but submitted the case to the jury on the lesser-included offense of battery. After deliberation, the jury found defendant guilty of battery, and defendant was sentenced to 364 days in the county jail.

The first issue is whether defendant was proven guilty of battery beyond a reasonable doubt. Defendant argues the State failed to prove that Kelly Gomes suffered bodily harm as a result of any actions by defendant on either March 8 or 9, 1989, and therefore, the battery conviction should be reversed.

There need not be direct evidence of injury to sustain a conviction of battery based upon bodily harm. (*People v. Rotuno* (1987), 156 Ill. App. 3d 989, 992, 510 N.E.2d 463, 465.) Our supreme court has said that "[a]lthough it may be difficult to pinpoint exactly what constitutes bodily harm for the purposes of the statute, some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." (*People v. Mays* (1982), 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36.) Basically, evidence of contact between a defendant and the victim, combined with the jury's common knowledge, is sufficient to establish that a defendant's conduct has caused bodily harm. (*Rotuno*, 156 Ill. App. 3d at 992, 510 N.E.2d at 465.) For example, in *Rotuno*, this court found that evidence that the defendant kicked a police officer in his legs and midsection while the officer was trying to push the defendant into a police car with the assistance of another officer and that such attempts were unsuccessful until a citizen stopped to assist both officers was sufficient to prove by circumstantial evidence that the officer who was kicked suffered some physical pain. (156 Ill. App. 3d at 992-93, 510 N.E.2d at 465-66.) Likewise, in *People v. Claudio* (1973), 13 Ill. App. 3d 537, 300 N.E.2d 791, it was found that kicking of police officers was in and of itself "causing bodily harm" within the meaning of section 12—3 of the Code (Ill. Rev. Stat. 1971, ch. 38, par. 12—3) even though both police officers in that case testified that they did not sustain any injuries. *Claudio*, 13 Ill. App. 3d at 540, 300 N.E.2d at 793.

■ In the present case, Eric Degroot and his mother, Sheila Linxwiler, both testified that defendant had Kelly suspended in the air, upside down, dangling by his right ankle. In this position, defend-

ant jerked Kelly a minimum of four times according to both witnesses' testimony. Both testified that Kelly cried after this incident. The cry was described as a "shriek" or "an alarming cry" and was said to have continued for some time afterward. While defendant and Dustie Gomes related different versions of this event, both admitted that Kelly was crying, and defendant admitted that he was not holding Kelly in the proper manner in which a baby should be held. The trial court directed a verdict on the aggravated battery charge because the State did not prove beyond a reasonable doubt that the "green-stick" fracture suffered by Kelly and diagnosed on April 21, 1989, was attributable to the incident on March 8 or 9. Even though the green-stick fracture may not have been caused by defendant's actions some six weeks earlier, the evidence was sufficient for the jury to conclude that defendant did, indeed, cause physical pain necessary to constitute physical harm within the meaning of section 12—3(a)(1) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 12—3(a)(1)). As stated in *People v. Garrett* (1973), 11 Ill. App. 3d 142, 296 N.E.2d 44, where the defendant challenged the sufficiency of the evidence as to bodily harm inflicted:

"As to each of these contentions we are inclined to hold that there are questions of fact to be resolved by the trier of fact. It is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of the disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses. [Citations.] We will not reverse a criminal conviction where the evidence is not so improbable as to raise a reasonable doubt of guilt. [Citation.] We do not find the evidence in this case to be so improbable as to raise a doubt as to the defendant's guilt." (11 Ill. App. 3d at 145, 296 N.E.2d at 46.)

Likewise, in the case at bar, we find that there was sufficient evidence to sustain the conviction for battery.

The second issue we are asked to consider is whether the trial court erred in admitting evidence of other acts of abuse to Kelly Gomes by defendant. Defendant contends that these other incidents were irrelevant to the issue whether defendant had committed the battery charged in the information and prejudicial in that the evidence of other incidents suggested that other crimes of violence had been committed against Kelly Gomes by defendant. The State responds that these other incidents were relevant and that the proba-

tive value of these other incidents outweighed their prejudice. We agree with the State.

Generally, evidence of other crimes is inadmissible if relevant only to establish the defendant's propensity to commit crimes. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) Evidence of another crime may be used only when the other crime has some threshold similarity to the crime charged, since it is the similarity which increases the relevance of the evidence and ensures that it is not being used only to establish the defendant's criminal propensities. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59, 66.) Evidence of the commission of another crime is admissible when such evidence is relevant to prove motive or intent, identity, absence of mistake or accident, or the existence of a common scheme or design. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821, citing *People v. Lehman* (1955), 5 Ill. 2d 337, 342-43, 125 N.E.2d 506, 509.) Moreover, the admission of evidence is within the sound discretion of the trial court, and its ruling will not be disturbed absent a clear showing of abuse. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.

■ In the instant case, the battery by defendant to Kelly Gomes on March 8 or 9 was established by the testimony of Eric Degroot and Sheila Linxwiler. Defendant's own testimony concerning this incident, that he held Kelly by his calves, seems unconvincing. Had defendant not committed this battery, he most likely would not remember how he held Kelly on the dates in question, as nothing would have been out of the ordinary. Defendant's testimony in this regard, along with Dustie Gomes' testimony concerning the incident in question, was disjointed. The jury could certainly have deduced that both were not telling the truth. However, we believe that the additional testimony allowed by the trial court concerning other acts of abuse was relevant to the issue whether defendant committed this particular battery. The evidence of other crimes against Kelly Gomes by defendant was relevant to show defendant's intent and absence of an innocent frame of mind. When evidence of other crimes is offered to prove the absence of an innocent frame of mind or presence of criminal intent, general areas of similarity between the crimes will suffice. (*People v. McKibbins* (1983), 96 Ill. 2d at 185-86, 449 N.E.2d at 825; see also *People v. Bartall* (1983), 98 Ill. 2d 298, 456 N.E.2d 59.) We believe the testimony that defendant poked Kelly, "flipped" Kelly's face with his finger, held Kelly by the skin of his throat with his thumb and forefinger, held his hand over Kelly's mouth and nose for 5 to 10 seconds, and pushed urine in a syringe down Kelly's throat showed sufficiently similar incidents, in that they all involved inci-

dents of abuse against Kelly Gomes by defendant, to make the testimony admissible on the issue of intent. Moreover, these other incidents tended to show that defendant's conduct on March 8 or 9 was not a mistake—that defendant did not inadvertently pick Kelly up incorrectly or play with him too roughly. Rather, these incidents tend to show that defendant was pursuing a course of conduct consisting of similar acts. This raises an inference that during the incident in question defendant had the requisite intent and was not acting under a mistake. See generally 2 J. Wigmore, *Evidence* §302 (Chadbourn rev. ed. 1979).

In further support of our decision that the trial court did not abuse its discretion in allowing testimony concerning other incidents of abuse, we note that the trial court did not allow the State to introduce all incidents of abuse by defendant to Kelly. For example, the trial court granted defendant's motion *in limine* to exclude evidence that defendant had blown marijuana smoke in Kelly's face. In considering the relevancy of that evidence, the trial court found that the probative value did not outweigh the prejudice to defendant. The trial court found that defendant would be severely prejudiced by the jury learning of defendant's illicit drug use. We also note that the jury was given a limiting instruction concerning how to consider the evidence of other acts of abuse committed against Kelly Gomes by defendant. The following instruction was tendered by the State and given without objection:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the information. This evidence has been received solely on the issue of defendant's intent or design. This evidence may be considered by you only for the limited purpose for which it was received."

Defendant contends that this limiting instruction was insufficient to overcome the prejudicial effect of the evidence of other crimes. We disagree.

As previously stated, we find that the trial court was within its discretion to allow the evidence of similar acts of abuse to Kelly Gomes by defendant to be admitted. The trial court properly instructed the jury as to why this evidence of other offenses had been introduced, and we believe that the probative value of this evidence outweighed its prejudicial effect.

The final issue raised by defendant is whether the penalty provided for the offense of battery as applied to this case violates the constitutional assurances of proportionate penalties and due process. We find that it does not.

Defendant was convicted of battery, a misdemeanor, and was sentenced to 364 days in the county jail, the maximum sentence allowed. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—3(a)(1).) Because the offense involved physical harm, defendant is denied the misdemeanant good-behavior allowance. (See Ill. Rev. Stat. 1989, ch. 75, par. 32.) Defendant argues, however, that he could have been convicted of cruelty to a child (Ill. Rev. Stat. 1989, ch. 23, par. 2368), a Class 4 felony. Had defendant been convicted of cruelty to a child rather than a misdemeanor battery, and had defendant been sentenced to the maximum nonextended term for a Class 4 felony, which is three years (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(7)), he would have been eligible for day-for-day good-behavior credit (Ill. Rev. Stat. 1989, ch. 38, par. 1003—6—3(a)(2)) and up to 90 days' additional good-behavior credit for meritorious service (Ill. Rev. Stat. 1989, ch. 38, par. 1003—6—3(a)(3)), thereby reducing a three-year sentence to one year and three months. Therefore, defendant would serve three months and one day more on the cruelty-to-a-child felony conviction than he would for serving the maximum sentence for his battery conviction. However, defendant contends that he would only have been required to serve a one-year sentence on a conviction for cruelty to a child because he would have been eligible for 180 days' additional good-conduct credit for meritorious service rather than only 90 days of such good-conduct credit, since defendant contends that section 3—6—3(a)(3) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1003—6—3(a)(3)), as amended, is unconstitutional. Defendant argues that section 3—6—3(a)(3) treats similarly situated persons, those who are serving sentences of imprisonment for offenses involving actual or physical harm, differently than others in that section 3—6—3(a)(3) denies the additional 90 days' meritorious-conduct credit for particular offenses but allows the additional credit for what defendant claims are comparable and, in some instances, more serious offenses.

■ In answer to defendant's argument, we note first that we are not dealing with section 3—6—3(a)(3) of the Unified Code of Corrections, as defendant was not convicted of cruelty to a child. One cannot question the constitutionality of a statute unless he is injuriously affected by the alleged unconstitutional provision. (*Liberty National Bank v. Collins* (1944), 388 Ill. 549, 559, 58 N.E.2d 610, 614.) We need only consider whether the penalty scheme now in place is in violation of our constitution.

Article I, section 11, of our constitution requires "the legislature, in defining crimes and their penalties, to consider the constitutional goals of restoring an offender to useful citizenship and of providing a

penalty according to the seriousness of the offense." (*People v. Taylor* (1984), 102 Ill. 2d 201, 206, 464 N.E.2d 1059, 1062.) Under the State's police power, the legislature has wide discretion to prescribe penalties for defined offenses. (*People v. Morris* (1990), 136 Ill. 2d 157, 161, 554 N.E.2d 235, 236.) The standard of review under the proportionate-penalties provision has been stated in *People v. Gonzales* (1962), 25 Ill. 2d 235, 184 N.E.2d 833:

> "This court has traditionally been reluctant to override the judgment of the General Assembly with respect to criminal penalties. It indicated at an early date that the constitutional command that 'penalties shall be proportioned to the nature of the offense' would justify interference with the legislative judgment only if the punishment was 'cruel,' 'degrading' or 'so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " 25 Ill. 2d at 240, 184 N.E.2d at 835.

Initially, defendant herein was charged with a felony, aggravated battery of a child (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.3(a)), but because the evidence adduced at trial did not establish that defendant had caused great bodily harm to Kelly, the case was submitted to the jury on the lesser-included offense of battery. Had defendant been charged and convicted of cruelty to a child rather than the resulting misdemeanor battery, the fact remains that defendant committed the same act of abuse and Kelly Gomes suffered the same pain regardless of what label is attached. But had defendant been convicted of cruelty to a child, a felony, and served only 91 more days than he was sentenced to serve for his misdemeanor battery conviction, defendant would still have had additional penalties besides a longer sentence imposed as the result of being convicted of a felony. Those convicted of a felony become ineligible to hold public office. (Ill. Const. 1970, art. XIII, §1.) Additionally, even if a felon is released early due to the accumulation of good-time credits, a felon can be reincarcerated for an act which would constitute a violation of parole. (Ill. Rev. Stat. 1989, ch. 38, par. 1003—3—9(a)(3)(i)(B).) On the other hand, a misdemeanant's early release is unconditional. (For a discussion of the distinctions between felons and misdemeanants see *People v. Burton* (1981), 100 Ill. App. 3d 1021, 427 N.E.2d 625.) Assuming, *arguendo*, that defendant could have been charged and convicted of cruelty to a child, we are not shocked or morally outraged by the penalties provided for battery versus cruelty to a child, nor do we find the punishment imposed on defendant to be "cruel" or "degrading."

■ When determining whether a statute violates the due process provision of the Illinois Constitution (Ill. Const. 1970, art. I, §2), a court must determine "whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare." (*Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 159, 128 N.E.2d 691, 695.) For example, in *People v. Bryant* (1989), 128 Ill. 2d 448, 539 N.E.2d 1221, our supreme court addressed the issue whether possession of a stolen motor vehicle is a lesser-included offense of theft. The defendant argued that possession of a stolen motor vehicle was a lesser-included offense of theft and because possession of a stolen motor vehicle carried a greater penalty than theft, there was a violation of the due process and proportionate-penalty clauses of the Illinois Constitution. (Ill. Const. 1970, art. I, §§2, 11.) The *Bryant* court disagreed and found that the steady increase in the penalty for possession of a stolen motor vehicle was "indicative of the legislature's intent to make possession of a stolen motor vehicle a separate, more serious offense than theft, rather than a lesser included offense of theft." (*Bryant*, 128 Ill. 2d at 457, 539 N.E.2d at 1225.) The *Bryant* court found that the General Assembly was attempting to protect the public from the evils of possession of a stolen motor vehicle and its related activities, commonly referred to as "chop shops," so the statutory scheme in place was not a violation of either section 2 or section 11 of article I of the Illinois Constitution. 128 Ill. 2d at 456, 539 N.E.2d at 1226.

In the instant case, the good-time provision for misdemeanants does not allow those convicted of inflicting physical harm upon another, including children, to receive the good-behavior allowance. (Ill. Rev. Stat. 1989, ch. 75, par. 32.) The good-time provision provided for felons does not prohibit the allowance of good-time credit for those convicted of inflicting physical harm upon another but does limit to 90 days rather than 180 days the good-conduct credit for meritorious service for those convicted of various offenses involving the infliction of physical harm, including the offense of cruelty to a child. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1003—6—3(a)(2), (a)(3).) Thus, both the County Jail Good Behavior Allowance Act (the Act) (Ill. Rev. Stat. 1989, ch. 75, par. 30 *et seq.*) and the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1001—1—1 *et seq.*) provide for less good-time accumulation for those prisoners convicted of acts involving the infliction of physical harm to children. We believe that the General Assembly's decision to disallow good-time credit for those convicted of acts involving physical harm to all persons, including children, is in

response to the increase in violent crime, especially abuse directed toward children. The statutory scheme set in place by section 3 of the Act (Ill. Rev. Stat. 1989, ch. 75, par. 32) is reasonably designed to remedy this evil. As such, section 3 of the Act does not violate either section 2 or section 11 of article I of the Illinois Constitution.

For the foregoing reasons, the judgment of the circuit court of Richland County is affirmed.

Affirmed.

LEWIS and CHAPMAN, JJ., concur.