THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL HALL, Defendant-Appellant.

First District (3rd Division)   No. 1—89—1841

Opinion filed September 2, 1992.

RIZZI, J., dissenting.

Stephen M. Komie and Marco A. Raimondi, both of Komie & Associates, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall E. Roberts, and Mary Brigid Kenney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

In a jury trial, defendant Paul Hall was convicted on five counts of aggravated criminal sexual abuse involving a foster child who resided in his home. Defendant was sentenced to four years in prison.

On appeal, defendant alleges the trial court erred by (1) refusing to exclude the testimony of a witness, K.H., without an evidentiary hear-

ing regarding the loss of an audiotape of the initial interviews with the witness that had last been in the prosecutor's possession; (2) allowing two witnesses to testify to similar acts of sexual abuse that defendant performed upon them; (3) allowing testimony by police and a physician of prior consistent statements by complainant D.S.; and (4) permitting the State to present extrinsic evidence on rebuttal to impeach defendant on collateral matters inquired of him on cross-examination.

We affirm defendant's conviction.

The complainant, D.S., was 13 years old in February 1986 when he was placed in defendant's foster home by a Department of Children and Family Services (DCFS) caseworker. Defendant is well known in his community, not only as the minister of his church, but for his active community involvement which includes his founding of the Paul Hall Boys Club, a gang hotline and a food distribution program for the needy.

D.S. testified that his sleeping quarters were defendant's bedroom, initially on a mattress on the floor, later with defendant in his bed. On several occasions during May 1986 defendant told D.S. to remain at home after dinner to answer the telephone while the other foster boys who lived with defendant went to the Paul Hall Boys Club. The boys who lived in defendant's home went to the club for activities several evenings each week.

During these evenings, defendant sought to become sexually intimate with D.S. and on the third evening, defendant performed fellatio on an unwilling D.S. When D.S. objected to this conduct, defendant told him that "no matter where you go or where you live, you are going to have to do something for someone" and "in order for me to do something for you, you're going to have to do something for me."

On at least two occasions later in the month, defendant performed fellatio on D.S. and then performed anal intercourse upon the young boy. When D.S. screamed in pain, defendant stopped and told him "You did good."

On June 7 and June 14, 1986, defendant told D.S. and K.H., another minor residing with defendant, to stay home while the others left the house for church activities. Defendant ordered the boys into his bedroom and directed each of them to touch and fondle the other, then, on each of those days, required one boy to watch while defendant performed anal intercourse on the other boy.

After that experience, D.S. testified that defendant performed anal intercourse, using a lubricant, every other week and performed oral intercourse every week. The sexual relations continued for 20 months until December 1987. The incidents occurred when the other boys were at

the boys club and defendant told D.S. to remain at home to answer the phone, which defendant would take off the hook.

In November 1986, on at least two occasions, defendant showed D.S. homosexual pornographic movies, told him to wear women's lingerie which defendant provided, and gave him a drug called Rush, supposedly a muscle relaxant, prior to fellatio and anal intercourse. D.S. testified that defendant kept the movies, lingerie and Rush in a box in a crawl space accessed through defendant's bedroom closet.

D.S. testified that defendant gave him money every day, nice clothes, a watch, radio, cassette player and bicycle. Occasionally, after their sexual encounters, defendant would tell D.S., "You did good."

On the morning of January 18, 1988, D.S. left the boys club around noon, never intending to return to defendant's home. Police found him sleeping at O'Hare airport at 1 a.m. the next morning. When the police informed him that they would return him to defendant's foster home, D.S. told them about the sexual activity occurring there because he feared defendant and did not wish to return to the situation.

K.H.'s testimony corroborated D.S.'s testimony regarding sexual acts that defendant performed on K.H. in D.S.'s presence and on D.S. in K.H.'s presence. K.H. testified that defendant told him that D.S. was going to replace K.H. and defendant was using K.H. as an example to D.S. K.H. stated that prior to D.S.'s arrival at defendant's foster home, K.H. had slept in defendant's bedroom and had been subjected to regular incidents of fellatio and anal intercourse with defendant.

K.H. testified that during 1984, sexual encounters between K.H. and the defendant occurred several times per week and that defendant was generous in giving him cash and gifts.

When defendant wanted K.H. to have sex with him, he would require him to remain home to answer the phone. K.H. testified that defendant also used a lubricant when he performed anal intercourse, that the sexual activity took place in defendant's bedroom suite, that defendant asked K.H. to wear women's lingerie, and that he kept the lingerie in a box in the crawl space.

K.H. testified that when he tried to avoid the sexual encounters, defendant would repeatedly tell him that he had to endure them because nobody wanted to take care of him and he had nowhere else to turn. Finally, K.H. ran away from the house and subsequently enlisted in the Army.

T.W., another foster child in defendant's home, also testified that defendant performed sexual acts on him, beginning in October 1987,

the month that he moved into defendant's home. The incidents occurred when other household members were at the boys club and defendant ordered him to remain at home to answer the phone. The sexual activity occurred in defendant's bedroom suite; a lubricant was used; and when T.W. told defendant that he was in pain, defendant told him "You did good."

T.W. testified that defendant gave him money every day and often bought him expensive gifts and clothing, such as a radio, camera, watch, books and a $400 suit. When T.W. voiced his objection to the sexual activity, defendant told him he would have to do what defendant wanted or defendant would not adopt him or allow him to live in the house.

On January 19, 1988, the day after D.S. ran away from defendant's home, T.W., as instructed, was cleaning defendant's room when defendant entered and told him to go downstairs. T.W. then saw defendant and Darryl Hall, another resident, carrying belongings out of the house, a briefcase and a box with lingerie hanging out of it, which they placed in defendant's car before driving away.

T.W. stated that before he left defendant's bedroom, the door to the attic was closed, and after defendant left the house with the box, the door was open. At a meeting that evening, defendant told household members that they were not to talk to the police about the adults who lived in the house and that they were not to tell police that D.S. slept in defendant's room. T.W. stated that he lied to police that night because he feared defendant's power and connections.

During pretrial investigation, K.H., who was serving in the Army in California, was contacted and interviewed twice by a Salinas, California, police officer in early February 1988. On those occasions, the officer surreptitiously tape-recorded the interviews. Based upon their conversations, the officer wrote a five-page summary of K.H.'s statements and sent the written report and tape to the Cook County sheriff's office in Chicago, which forwarded the evidence to the Cook County State's Attorney.

Three months prior to trial, prosecutors notified defense counsel that they were unable to locate the tape pursuant to discovery requests, although the written summary prepared by the California police officer was available and provided to defendant. The court heard pretrial arguments on defendant's motion to bar the testimony of K.H. in which the State argued that the tape was inadvertently lost when the case was transferred to different prosecutors within the State's Attorney's office. The court denied the motion.

Defendant first contends that the trial judge erred when it denied his motion to exclude K.H.'s testimony because (1) prosecutors failed to comply with the discovery rules required in production of a tape of his interviews; (2) there was no evidentiary hearing regarding the cause or explanation for the loss of the tape; and (3) failure to hold a more formal hearing denied defendant the opportunity to present a jury instruction on failure of a party to produce evidence.

Defendant seeks a reversal and remandment for new trial where the testimony of K.H. would be excluded and a proper instruction given to the jury regarding the missing tape.

During the hearing on defendant's motion to bar K.H.'s testimony, the State acknowledged that the tape of the interviews had been received by the State's Attorney's office and thereafter lost or mislaid in the transfer and change in personnel handling the file. Neither of the assistant State's Attorneys then assigned to the case had heard the tape or knew of its contents.

When a search conducted within the State's Attorney's office proved unsuccessful, the State immediately contacted defense counsel to inform him of the lost tape. The State also timely advised defendant during pretrial investigation that the California police officer who prepared the tape was available for interviews, and the written report submitted by that officer was prepared from his direct conversations with K.H. rather than from the tape.

The State further acknowledged that it had inquired of both the Salinas, California, police department and the Cook County sheriff's office to determine whether duplicates of the tape had been made, although both responded that none had been prepared.

The defense did not avail itself of the opportunity to interview the California police officer since counsel believed that such an interview would not cure the problem of the lost tape nor did they desire a pretrial interrogation of K.H., although defendant did earlier attempt to obtain such interview and the witness was then uncooperative.

The defense also did not request a continuance to investigate the matter further, nor did it advance any other sanctions short of barring the testimony of K.H.

After argument of counsel, the court denied defendant's motion but advised him that it was open to consider any further motions at the time K.H.'s testimony was offered and would allow broad latitude in the cross-examination of K.H.

We recognize that it is the State's duty to zealously protect evidence in its possession, and the record must be carefully scrutinized for evidence of bad faith where relevant materials are alleged to be

lost or destroyed. *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333; *United States v. Augenblick* (1969), 393 U.S. 348, 21 L. Ed. 2d 537, 89 S. Ct. 528; *People v. Hammock* (1984), 121 Ill. App. 3d 874, 480 N.E.2d 378; *People v. Stamps* (1977), 52 Ill. App. 3d 320, 325, 367 N.E.2d 543.

While there may be a burden upon the State to explain its action or inaction and to establish its complete good faith (*Stamps*, 52 Ill. App. 3d at 325), the trial judge's determination and treatment of a discovery violation is generally given great weight. *People v. Weaver* (1982), 92 Ill. 2d 545, 558-59, 442 N.E.2d 255.

In *Stamps*, written statements of witnesses to a prison riot were lost or misplaced by the Attorney General's office. While there was some speculation that the loss occurred when the Attorney General moved into a new building, there was nothing in the record to verify such a fact with any degree of certainty. There was, however, no evidence in the record to suggest that the loss of the statements was the result of "guile, stratagem or craftiness." The court found the State acted in good faith, attempted to recover the statements and while it could only speculate what information the statements might contain, the evidence against defendant was so overwhelming that it was highly unlikely the statements might cast any reasonable doubt on defendant's guilt. *Stamps*, 52 Ill. App. 3d at 325.

Similarly, although the trial court in the present case could only speculate on what the tape might contain, there is a strong likelihood that the officer's memorandum made contemporaneously with the tape is accurate since its author would not have known that the tape would not be available to compare against his five-page report.

In *Hammock*, defendant was charged with murder and was improperly induced to give a statement that suggested murder or voluntary manslaughter or self-defense. The assistant State's Attorney convinced defendant to participate in a videotaped reenactment of the events leading up to the homicide.

The first of the reenactments was videotaped but apparently was not properly recorded, so a second reenactment was videotaped and the first tape discarded by the assistant State's Attorney.

In addition to other serious violations of defendant's constitutional rights, the conviction was reversed because of the admission of the second videotape into evidence. The court believed because of the close and critical factual differences between involuntary manslaughter and self-defense or murder, the nuances of the first tape would be

particularly important in allowing a seasoned defense counsel to evaluate defendant's conduct. *Hammock*, 121 Ill. App. 3d at 881.[1]

The *Hammock* court was properly suspicious of the State's explanation for the unavailability of the missing tape and noted that the State was charged with the safekeeping of the first tape and it was not for the assistant State's Attorney who discarded the tape to determine whether there was anything on the first tape which would have been beneficial to the defendant. *Hammock*, 121 Ill. App. 3d at 882.

However, in *Hammock*, the State intentionally discarded the first videotape while, in the case at bar, the State has represented that the tape had been accidentally lost, and during the hearing, defense counsel acknowledged he had no reason to doubt the assistant State's Attorney in this regard.

Additionally, in *Hammock*, defendant's fifth amendment rights were violated by the resumption of custodial interrogation after defendant declined to make a statement. Therefore, subsequent confessions, exculpating statements and inculpatory video reenactments of the homicide which occurred before defendant had access to counsel were nullified. The intentional destruction of the first tape is irrevocably intertwined with the *per se* violation of defendant's fifth amendment rights. No such issue was present in the instant case.

The tapes involved in *Hammock* were statements of the defendant while K.H.'s testimony was that of a witness only. Moreover, the tape here was not used in any way against the defendant and we are left only to speculate what the tape might have contained.

The State cites *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333, the most significant recent decision relating to the subject, where a 10-year-old boy was sexually assaulted and the State failed to preserve potentially useful evidence, including swab samples taken from the victim's mouth and rectum. The *Youngblood* court found no violation of defendant's due process rights since defendant failed to show bad faith by the State in connection with the loss or failure to preserve the evidence. (*Youngblood*, 488 U.S. at 57, 102 L. Ed. 2d

---

[1]The dissenting justice in the instant case has declined to reverse on other occasions by reason of lost evidence: *People v. Kidd* (1989), 180 Ill. App. 3d 1065, 536 N.E.2d 816, where defendant's conviction was affirmed although a gunshot residue test performed on another suspect was destroyed by police notwithstanding defendant's claim that the test results were "potentially exculpatory," and *People v. Davis* (1981), 103 Ill. App. 3d 792, 431 N.E.2d 1210, where defendant claimed that the contents of a briefcase, lost by the police, would provide him with an alibi. The court observed that defendant did not in brief or oral argument specifically show how the contents would provide an alibi and that such was essential to secure reversal.

at 289, 109 S. Ct. at 337.) The Court stated that the failure to preserve the evidence was, at worst, negligence on the part of the police, that defendant was notified of the situation and allowed all access to the remaining evidence. *Youngblood*, 488 U.S. at 57-58, 102 L. Ed. 2d at 289-90, 109 S. Ct. at 337-38.

In *Youngblood*, the Supreme Court placed the burden of finding bad faith upon the defendant. (*Youngblood*, 488 U.S. at 57, 102 L. Ed. 2d at 289, 109 S. Ct. at 337.) The "bad faith" test has continued to be the rule in Illinois where the State fails to preserve potentially useful evidence. *People v. Young* (1991), 220 Ill. App. 3d 488, 581 N.E.2d 241; *People v. Stallings* (1991), 211 Ill. App. 3d 1032, 570 N.E.2d 820; *People v. Lampkin* (1990), 193 Ill. App. 3d 570, 550 N.E.2d 278.

The State's actions in *Hammock* and *Youngblood* were more violative of the rights of the defendant than in the case before us. In both of those cases, the destroyed material might have provided exculpatory evidence for the defendant, while in the instant case the best evidence for which defendant can reasonably hope is a prior inconsistent statement by one of the witnesses for use in impeachment.

Our supreme court provided a thorough analysis of *Youngblood* in *People v. Holmes* (1990), 135 Ill. 2d 198, 552 N.E.2d 763, dealing with prosecutorial failure to disclose evidence, *i.e.*, introduction of an informer. *Holmes*, like *Youngblood*, uses a "bad faith" standard in assessing the due process implications of the State's failure to preserve what the cases describe as potentially exculpatory evidence. The test, therefore, is whether the defendant can show bad faith on the part of law enforcement officials.

As we have previously noted, we doubt that the tape of the interview with K.H. rises to the definition of "potentially exculpatory evidence." Courts also consider the defendant's opportunity to seek the lost evidence by other means. Here, defendant's opportunities were ample. K.H. testified before the grand jury, was available on the day of trial for an interview with the defense and was subjected to withering cross-examination.

There is a plethora of Illinois decisions which affirm convictions notwithstanding the loss or destruction of evidence which defendants believed might have been helpful to their defense.[2]

---

[2]The dissent to the opinion originally filed cites 31 such cases, but neglects to indicate that none, except *Hammock*, was reversed by reason of the loss or destruction by the State of such evidence.

The material lost or mislaid ranges from blood samples, medical or physical tests, X rays or tissue;[3] audio tapes, video tapes or communication recordings;[4] police reports;[5] weapons;[6] bullets;[7] controlled substance;[8] and various types of contraband;[9] to photographs of defendant reenacting his encounter with the victim.[10]

Other jurisdictions (United States, Alaska, Arizona, California, Colorado, Connecticut, Idaho, Massachusetts, Michigan, Minnesota, New Mexico, New York, North Dakota, Texas, and Washington) have determined that where audio tapes have been lost or mislaid by the State, courts are not required to accept the defendant's speculative version of the favorable nature of the lost tapes to the defense. These courts, in dealing with such missing tapes and affirming the convictions, have considered (1) the importance of the missing evidence to the whole case, (2) the degree of negligence, bad faith or culpability by the government, (3) the likelihood that the tapes were exculpatory, (4) prejudice suffered by the defendant by reason of the absence of the tapes, and (5) other evi-

---

[3]*People v. Stallings* (1991), 211 Ill. App. 3d 1032, 570 N.E.2d 820; *People v. Lampkin* (1990), 193 Ill. App. 3d 570, 550 N.E.2d 278; *People v. Kidd* (1989), 180 Ill. App. 3d 1065, 536 N.E.2d 816; *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303; *People v. Emrich* (1986), 113 Ill. 2d 343, 498 N.E.2d 1140; *People v. Howard* (1985), 130 Ill. App. 3d 967, 474 N.E.2d 1345; *People v. Clark* (1984), 124 Ill. App. 3d 14, 463 N.E.2d 981.

[4]*People v. Luallen* (1989), 188 Ill. App. 3d 862, 544 N.E.2d 1206; *People v. Nunn* (1989), 184 Ill. App. 3d 253, 541 N.E.2d 182; *People v. Vargas* (1983), 116 Ill. App. 3d 787, 452 N.E.2d 736.

[5]*People v. Lucente* (1987), 116 Ill. 2d 133, 506 N.E.2d 1269; *People v. White* (1985), 134 Ill. App. 3d 262, 479 N.E.2d 1121; *People v. Smith* (1983), 114 Ill. App. 3d 1007, 449 N.E.2d 912.

[6]*People v. Stevenson* (1990), 204 Ill. App. 3d 342, 562 N.E.2d 330; *People v. Lann* (1990), 194 Ill. App. 3d 623, 551 N.E.2d 276; *People v. Everette* (1989), 187 Ill. App. 3d 1063, 543 N.E.2d 1040; *People v. Zayas* (1987), 159 Ill. App. 3d 554, 510 N.E.2d 1125, *rev'd on other grounds* (1989), 131 Ill. 2d 284, 546 N.E.2d 513; *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592.

[7]*People v. Guest* (1986), 115 Ill. 2d 72, 503 N.E.2d 255; *People v. Colley* (1988), 173 Ill. App. 3d 798, 528 N.E.2d 223.

[8]*People v. Young* (1991), 220 Ill. App. 3d 488, 581 N.E.2d 241; *People v. Ebener* (1987), 161 Ill. App. 3d 232, 514 N.E.2d 205; *People v. Lopez* (1982), 107 Ill. App. 3d 792, 438 N.E.2d 504.

[9]*People v. Jones* (1991), 215 Ill. App. 3d 652, 575 N.E.2d 561; *People v. Ambrose* (1988), 171 Ill. App. 3d 87, 525 N.E.2d 536; *People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921; *People v. Madej* (1985), 106 Ill. 2d 201, 478 N.E.2d 392.

[10]*People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547.

dence sufficient to amply provide for defendant's conviction.[11]

We have already addressed the nature of the hearing held with respect to the loss of the tape. The court might have compelled assistant State's Attorneys to testify as to who last held the tape in their possession or who last received it, and such a course of action is highly approved.

■ The defendant claims the failure to hold a more formal hearing denied him the opportunity to present a jury instruction on the inferences to be considered where a party fails to produce evidence within its control, and he sets out the full text of Illinois Pattern Jury Instruc-

---

[11]Convictions affirmed despite loss of tapes by prosecution:

*United States v. Arra* (1st Cir. 1980), 630 F.2d 836 (negligent erasure of tape which defendants alleged would provide material from which to impeach government witness in drug prosecution); *United States v. Rastelli* (2d Cir. 1989), 870 F.2d 822 (government's loss of three allegedly exculpatory tape recordings of witnesses' conversations in bid-rigging scheme where the exculpatory nature of the evidence was not apparent before it was lost and defendant could have obtained comparable evidence by using contemporaneously prepared FBI summaries, yet failed to do so); *United States v. Dye* (4th Cir. 1991), 931 F.2d 55 (government's failure to produce a tape of defendant's initial interview with the government's informant where there is no evidence that the tape was lost in bad faith, and defendant could cross-examine the informant at trial); *United States v. Cochran* (5th Cir. 1983), 697 F.2d 600 (government's failure to produce an inaudible tape of a conversation between defendant and drug enforcement agent where defendant had an opportunity to cross-examine the agents who witnessed the conversation and the evidence of guilt was overwhelming); *United States v. Monaco* (10th Cir. 1983), 700 F.2d 577 (government's failure to provide defendant with tape recording of statement given by a witness to police after trial testimony of the witness where there was no evidence of government misconduct, no prejudice by an inability to examine the lost recording, no evidence in the recording to exculpate defendants and other evidence against defendant was overwhelming); *United States v. Gerena* (D. Conn. 1988), 695 F. Supp. 1369 (government's disclosure on the first day of pretrial hearings that it taped and erased recordings of wiretapped conversations since the loss of tapes was inadvertent, tapes were not used as evidence, disclosure was made over one year before commencement of trial and defendants had a full opportunity to cross-examine); *State v. Bruno* (1991), 119 Idaho 199, 804 P.2d 928 (prosecution's loss of one of three tapes recorded from body mike transmissions where the nature and materiality of the lost evidence was established through trial testimony and there was no showing of bad faith or disregard of defendant's rights by police); *Commonwealth v. Charles* (1986), 397 Mass. 1, 489 N.E.2d 679 (loss of tape-recorded interview with the rape victim did not require reversal where there was no suggestion that loss of the tape was intentional or due to bad faith, and no demonstration of how it would have

tions, Civil, No. 5.01 (2d ed. 1971). It is difficult to imagine how a more formal hearing would have affected defendant's right in that regard. The record does not reveal that defendant offered such an instruction or asked the court to advise the jury as to the tape during the cross-examination of K.H. or otherwise suggested that there might be inconsistent statements or failure to produce evidence, although the trial court had invited additional motions.

In any event, the jury instruction cited by defendant has been prepared for use in civil cases and its use in criminal cases could result in plain error since it clearly could be interpreted to conflict with a defendant's fifth amendment right to remain silent. Moreover, the Illinois Supreme Court Committee on Pattern Jury Instructions in Crim-

been exculpatory); *People v. Amison* (1976), 70 Mich. App. 70, 245 N.W.2d 405 (loss by police of a tape recording of a conversation between defendant and an undercover agent where the loss was not in bad faith or grossly negligent and witnesses testified that the recording was inculpatory in nature); *People v. Taylor* (1988), 142 A.D.2d 410, 536 N.Y.S.2d 825 (destruction of a tape of attempted rape victim where it was not clear whether the prosecution was culpable in bringing about the destruction and the resulting prejudice was minimal); *State v. Bartlett* (1990), 109 N.M. 679, 789 P.2d 627 (State failed to produce tape of its interview with rape victim but evidence turned over to defendant was sufficient to present inconsistencies in the victim's description of her attacker and lesser sanctions were available to alleviate harm caused by the missing tape); *City of Bismarck v. Bauer* (N.D. 1987), 409 N.W.2d 90 (State inadvertently erased a videotape of defendant's performance of physical tests after his DUI arrest where the tape did not possess exculpatory value apparent to the prosecution before it was erased); *State v. Farrell* (Minn. App. 1989), _____ N.W.2d _____ (State destroyed a tape of the police radio transmissions and a videotape of defendant's DUI booking but there was no showing of bad faith and the exculpatory value of the destroyed evidence was unknown); *State v. Davis* (Tex. App. 1992), _____ S.W.2d _____ (taped interview with murder victim's neighbor was erased but there was no evidence of misconduct to indicate bad faith); *State v. Laureano* (1984), 101 Wash. 2d 745, 682 P.2d 889 (prosecution failed to produce tape recording of interview with victim's wife but defendant failed to show that the interview was ever recorded); *State v. Shaw* (Conn. 1981), 441 A.2d 561 (where defendant failed to show that his defense would have been materially aided by access to tape recording of first police interview with witness, there was no violation of defendant's confrontation and due process rights since no bad faith was shown to explain the tape's absence); *cf. United States v. Fletcher* (10th Cir. 1986), 801 F.2d 1222 (case remanded to determine whether exculpatory value of tape recordings of conversations between defendants and informant was apparent before they were lost and whether defendants would be unable to obtain comparable evidence by other reasonably available means); *State v. Cortez* (1990), 149 Misc. 2d 886, 564 N.Y.S.2d 963 (appropriate remedy for erasure of subpoenaed police communication tapes was dismissal where the tapes were erased after the court's order and follow-up request to release the tapes were defied).

inal Cases "took the position that no instruction would be included on particular types of evidence, unless some special guidance from the trial judge would be useful." Illinois Pattern Jury Instructions, Criminal, Introduction, at VII (2d ed. 1981).

In *Youngblood,* the jury was instructed that if it found the State had lost or destroyed evidence, it might infer "that the true fact is against the State's interest." No such instruction was offered by defendant in the instant case or requested at any hearing, and the failure of the court to provide such an instruction *sua sponte* is not a denial of due process. *Youngblood,* 488 U.S. at 54, 102 L. Ed. 2d at 287, 109 S. Ct. at 335.

We conclude that both defendant's right and prejudice in this regard are illusory; further, he cannot raise this issue regarding an instruction for the first time on appeal.

Exclusion of evidence for a discovery violation is a harsh measure and other sanctions are initially preferred. *People v. Aguilar* (1991), 218 Ill. App. 3d 1, 9-10, 578 N.E.2d 109; *People v. Washington* (1989), 182 Ill. App. 3d 168, 174, 537 N.E.2d 1354.

Supreme Court Rule 415(g) leaves it to the trial court to fashion sanctions if a party fails to comply with the discovery rule or order. (134 Ill. 2d R. 415(g).) Such sanctions may include the granting of a continuance, the inclusion or exclusion of disputed evidence or such other order as the court deems just under the circumstances. 134 Ill. 2d R. 415(g)(i).

*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335, is particularly instructive in this regard where the prosecution failed to supplement pretrial discovery with a witness' oral corrections of a statement made to a Department of Corrections investigator. In *Harris,* the extensive cross-examination allowed of the witness was deemed sufficient to overcome the willful discovery violation by the State. *Harris,* 123 Ill. 2d at 152.

K.H. was subjected to withering cross-examination for an extended period of time (more than 120 pages of transcript) by one of the legal community's most prominent defense counsel. Inconsistencies and discrepancies were exploited freely during cross-examination and defense counsel was allowed to question the witness on some criminal activity.

The failure to comply with discovery requirements does not in all instances necessitate a new trial. (*Harris,* 123 Ill. 2d at 151; *People v. Nettnin* (1991), 216 Ill. App. 3d 794, 799, 576 N.E.2d 417; *People v. Siefke* (1990), 195 Ill. App. 3d 135, 142, 551 N.E.2d 1361.) Generally, a new trial should be granted only if the defendant is prejudiced by

the discovery violation and the trial court failed to eliminate the prejudice. *Harris*, 123 Ill. 2d at 151-52; *People v. Cisewski* (1987), 118 Ill. 2d 163, 172, 514 N.E.2d 970.

In the case before us, the court has clearly taken steps to eliminate the prejudice. Moreover, defense counsel had the benefit of the five-page report prepared by the California police officer contemporaneously with the interviews of which the recordings were the subject matter, and which were not likely to differ greatly from the recordings since the officer could not have known that the tape would not be available to exploit any inconsistencies in his report.

■ While we do not in any sense condone the State's negligence in misplacing the tape, we believe that reversal is unwarranted by reason of this violation because (i) the record discloses no evidence that the State acted willfully to destroy the tape; (ii) the State informed defense counsel months before trial that the tape had been lost and attempted to determine if other copies of the tape existed; (iii) a five-page memorandum of the interviews was made at the time by the police officer; (iv) defense counsel never requested or offered a jury instruction regarding the missing tape and the instruction cited in defendant's brief has been fashioned for use in civil cases; (v) defense counsel never sought to interview the California police officer or take advantage of the opportunity to conduct a pretrial interview of K.H. on the day the trial started; and (vi) defense was offered great latitude in its lengthy cross-examination of K.H.

Even without K.H.'s testimony, the evidence in this case is not closely balanced, especially since D.S. gave protracted testimony regarding specific acts that defendant repeatedly performed and T.W. gave corroborating testimony describing defendant's *modus operandi*. Not only could the jury have found the essential elements of aggravated criminal assault beyond a reasonable doubt (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461), but we find the weight of the evidence overwhelming.

Defendant next argues that the trial court erred when it allowed K.H. and T.W. to testify concerning defendant's sexual abuse of them at other times. Defendant contends that such other crimes evidence was offered only to show defendant's propensity to commit the crime charged.

Evidence of other crimes or wrongful conduct is not admissible simply to show defendant's character or propensity to commit the crime charged, but may be admissible for other relevant purposes. (*People v. Gaither* (1991), 221 Ill. App. 3d 629, 636, 582 N.E.2d 735.) Here, the trial court carefully instructed the jury to limit its consider-

ation of the other crimes evidence only to the issue of *modus operandi* or common design or scheme.

Where evidence of prior bad acts is offered to prove *modus operandi* or that the crime charged was part of a common design or plan, there must be a high degree of identity between the facts of the crime charged and the other offense in which the defendant was involved; the offenses must share such distinctive common features as to earmark both acts as the handiwork of the same person. *People v. Illgen* (1991), 145 Ill. 2d 353, 372-73, 583 N.E.2d 515; *People v. Jones* (1991), 215 Ill. App. 3d 903, 911, 576 N.E.2d 162.

Although a proper case may be made for the admission of other crimes evidence under the theory that defendant had a common design or scheme, we need not decide that issue since we find the evidence of other crimes is properly admitted as evidence of defendant's *modus operandi*.

While many Illinois courts have used the terms "common design or scheme" interchangeably with *modus operandi*, the terms have different meanings. *People v. Tipton* (1990), 207 Ill. App. 3d 688, 696, 566 N.E.2d 352.

*Modus operandi* refers to a method of working, a pattern of criminal behavior that is so distinct that separate crimes or wrongful conduct is recognized as being the work of the same person while common design refers to a larger criminal scheme of which the crime charged is only a portion. *Tipton*, 207 Ill. App. 3d at 694; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292.

*Modus operandi* is relevant to prove either the identity of the perpetrator or that the perpetrator committed the charged offense by allowing the jury to reasonably infer that he committed one offense from the evidence of the other, showing the "method of work" of the perpetrator. (*Tipton*, 207 Ill. App. 3d at 694; *People v. Maness* (1989), 184 Ill. App. 3d 149, 153, 539 N.E.2d 1368.) To be admissible, there must be some unique features between the offenses that are not common to that type of offense. (*People v. Tate* (1981), 87 Ill. 2d 134, 142, 429 N.E.2d 470.) While there must be a strong and persuasive showing of the similarity, it is not necessary that the crimes be identical for the other crimes to be admissible. *Tipton*, 207 Ill. App. 3d at 695; *Kimbrough*, 138 Ill. App. 3d at 487.

Defendant relies on *People v. Esterline* (1987), 159 Ill. App. 3d 164, 512 N.E.2d 358, a case in which the defendant was accused of taking indecent liberties with a neighborhood child and evidence of improper sexual incidents with other children was admitted and the conviction was reversed on appeal.

■ However, in *Esterline*, the State failed to establish the elements of the *modus operandi* exception since they failed to show that the offenses shared common distinctive features that would earmark the crimes as the handiwork of defendant.

In that case, the offense charged was defendant's lewd fondling of a seven-year-old girl's thigh, exposing himself and using lewd language. The court found that the other acts admitted into evidence demonstrated many more differences than similarities, situations in which defendant: explained pornography to a child; performed fellatio on a child and had that child perform fellatio on him; performed oral sex on a female child; ordered a child to rub his penis; masturbated in front of a child; exposed himself through his shorts; and masturbated through the centerfold of a magazine. Further, the acts did not all occur in the same location. Considering the many differences in the testimony, the court found that the other offenses only showed defendant had a propensity for taking indecent liberties with a child. *Esterline*, 159 Ill. App. 3d at 168.

However, in the present case, we find almost no differences between the charged offenses and the other crimes evidence admitted: all of the victims were young, African-American teenage males who came from distressed homes and lived at defendant's foster home during the time they were abused; defendant always asked each boy to stay home alone with him, ostensibly to answer the phone, while the other boys went to the boys club; defendant routinely took the telephone off the hook during that time; the incidents all took place in defendant's bedroom suite; defendant always used a lubricant before anal penetration; defendant routinely performed fellatio on D.S. and K.H.; defendant asked K.H. and D.S. to model women's lingerie, and both stated that he kept the lingerie in a box over his bedroom closet; defendant told the boys that they would have to do as he said since they had nowhere else to go; and defendant told each of the boys at least once after a sexual encounter, "You did good."

We find that there was a very strong and persuasive showing of similarities between the offenses described and that the similarities demonstrate unique features not necessarily common to all acts of aggravated sexual abuse, and therefore, establish defendant's *modus operandi*, or method of working.

Further, the trial court disallowed the testimony of another boy, A.M., who also alleged defendant performed criminal sexual acts upon him because it distinguished the offense as too remote in time. While this court has found that 15 years is not too remote in time for other crimes evidence to be admitted (*People v. Jendras* (1991), 216 Ill.

App. 3d 149, 576 N.E.2d 229), we do not decide that issue here, but recognize, in the exclusion of A.M.'s testimony, the trial court's careful consideration of possible prejudice to defendant from the other crimes evidence.

*Jendras* similarly allowed other crimes evidence to be used where defendant was a teacher convicted of aggravated criminal sexual abuse. In that case, the court found the incidents similar enough to constitute a pattern that fits within the *modus operandi* exception: all of the victims were males in junior high school who lived with their single mothers; defendant was their teacher; they went alone to his apartment when defendant asked them to go swimming; they were provided bathing suits by defendant; the acts of touching and fondling were similar; and defendant ceased action when the boys said they had to leave. (*Jendras*, 216 Ill. App. 3d at 159.) We find that the case at bar presents even stronger similarities establishing *modus operandi* than does *Jendras*.

Defendant next argues that testimony by Dr. Ahart and Officers Granberg and Swan included prior consistent statements of D.S. that should not have been admitted into evidence because they bolster D.S.'s testimony at trial. Defendant contends that it was reversible error when the trial court refused to limit their testimony to exclude statements made to them by D.S. regarding identification of defendant and details of the incidents.

■ Because defense counsel failed to raise objection at trial or include in his post-trial motions any issue as to the testimony of Officer Granberg, we find any error waived as to that witness. *People v. Williams* (1990), 139 Ill. 2d 1, 14, 563 N.E.2d 431.

The State argues that such testimony by Dr. Ahart is a statutory exception to the hearsay rule allowing medical personnel to testify as to statements made to them by victims of sex offenses:

> "[S]tatements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." Ill Rev. Stat. 1989, ch. 38, par. 115–13.

Although medical personnel may testify as to statements made by a sexual assault victim pertinent to medical diagnosis or treatment, they may not identify the alleged perpetrator. (*People v. Perkins* (1991), 216 Ill. App. 3d 389, 397-98, 576 N.E.2d 355; *People v. Sommerville* (1990), 193 Ill. App. 3d 161, 176, 549 N.E.2d 1315.) Further,

we reject the notion that the identification of the defendant to Dr. Ahart was proper merely because one of the options of treatment might have included removal of D.S. from defendant's home.

Although the testimony of Dr. Ahart includes improper prior consistent statements of D.S., any error in its admission is harmless where the evidence is not closely balanced, the testimony is merely cumulative of the sexual assault victim's testimony and, more particularly, where defense counsel had an opportunity to cross-examine the victim. *Williams,* 139 Ill. 2d at 15-16; *People v. Robinson* (1978), 73 Ill. 2d 192, 200, 383 N.E.2d 164; *People v. Enoch* (1989), 189 Ill. App. 3d 535, 556, 545 N.E.2d 429.

Officer Swan testified that after interviewing D.S., he notified DCFS and the State's Attorney's office and applied for a warrant to search defendant's house for items described by D.S. Thereafter, the officer related the statements made by D.S. in response to questions regarding what his investigation "disclosed" that caused him to act as he did during the course of that investigation.

The State argues that the testimony of Officer Swan which contains D.S.'s prior consistent statements should be admitted to show the course of his investigation as a youth officer and that a law enforcement officer may testify regarding investigatory procedures followed and the basis for such investigative activities.

Testimony in a criminal prosecution regarding investigatory procedures including hearsay statements of third parties may be admissible where the purpose of such testimony is limited to show the basis or reasons why an officer acted in a particular manner. *People v. Brown* (1983), 113 Ill. App. 3d 625, 631, 447 N.E.2d 1011.

In *Brown,* conversations between the officer and third parties which ultimately led to the apprehension of defendant were properly admitted where the statements were offered to show the course of the investigation rather than prove the truth of the matter asserted. No such reason exists in the instant case, although the State properly relies on *People v. Clark* (1987), 160 Ill. App. 3d 877, 513 N.E.2d 937, where a policeman's testimony that a witness had earlier identified a defendant at a pretrial lineup was harmless error since the witness was present throughout the trial and available for examination. See also *People v. Mitchell* (1990), 200 Ill. App. 3d 969, 975, 558 N.E.2d 559.

Prior consistent statements of testifying witnesses are generally inadmissible, although certain exceptions apply; most notably where the prior consistent statement is introduced to rebut a charge or inference that the witness is motivated to testify falsely or that his in-

court testimony is of recent fabrication. *People v. Hayes* (1990), 139 Ill. 2d 89, 138, 564 N.E.2d 803; *People v. Shum* (1987), 117 Ill. 2d 317, 340-41, 512 N.E.2d 1183; *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1072, 580 N.E.2d 1367.

The improper admission of prior consistent statements has, on occasion, been the basis of reversal. See, *e.g., People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41 (a case which turned solely on the credibility of the complainant or the defendant, where the evidence was closely balanced, and where improperly admitted evidence might bolster one of the parties enough to impact upon the trier of fact); *People v. Wheeler* (1989), 186 Ill. App. 3d 422, 427-28, 542 N.E.2d 524 (in which prior consistent statements amounted to plain error where proof of defendant's guilt depended almost entirely on the testimony of the prosecution's witness which the statements tended to corroborate).

While defendant failed to enumerate specifically, either by record page or testimony itself, which statements were alleged to be wrongfully admitted, we find that the record does establish that the testimony of Officer Swan and Dr. Ahart contains certain hearsay statements that were merely cumulative or corroborative of D.S's testimony as to what occurred in the defendant's home. Such testimony served no purpose except to bolster the credibility of the complainant over that of the defendant.

However, these statements amounted to a small portion of the testimony of the two witnesses and an even smaller part of the testimony heard by the jury. We have determined that the evidence in this case is not closely balanced and accordingly find that the defendant was not unfairly prejudiced by the admission of prior consistent statements. We decline to reverse on these grounds. See *Hayes*, 139 Ill. 2d at 139.

Finally, defendant argues that the trial court erred in permitting the State to present rebuttal evidence that impeached defendant on collateral matters inquired of him on cross-examination.

Defendant contends that he was questioned about many collateral matters including the truthfulness of information supplied to DCFS caseworker Gwendolyn King, whether he had taken his foster children to a doctor for regular examinations as required by DCFS, and his vote for mayor in the 1987 Chicago elections.

Initially, we find defendant has waived any error regarding the testimony of Gwendolyn King since he failed to object at trial or raise this issue in his post-trial motion and we find no plain error. *Williams*, 139 Ill. 2d at 14.

Further, defendant distorts the record when he contends he was cross-examined as to his 1987 mayoral vote. On direct exam, defendant stated that he lived in South Holland, Illinois. On cross-examination, the State inquired as to the address listed on his voter's registration card, and he admitted that he falsely listed an address on South Wolcott Avenue in Chicago. The record is clear that it was only on redirect that defense counsel asked about defendant's vote in the 1987 election, and that the prosecution never made such an inquiry.

The only issue remaining is defendant's contention that the State was improperly allowed to impeach him with rebuttal testimony regarding his cross-examination responses that he took the children to Dr. John Murphy for medical examinations required by DCFS.

Following the cross-examination of defendant, the State called Dr. Murphy, who testified, contrary to defendant, that none of the persons who lived in defendant's home was ever his patient, that he never recalled examining any of them, that he has no medical records for anyone living in defendant's home, and that the signature on the DCFS medical forms was not his.

The State argues that the rebuttal testimony of Dr. Murphy was proper because the issue of whether defendant's foster children received medical examinations required by DCFS was not collateral since medical examinations could have revealed defendant's sexual abuse.

Latitude allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 552 N.E.2d 726; *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267; *People v. Johnson* (1991), 218 Ill. App. 3d 967, 993, 578 N.E.2d 1274.

One of the purposes of attempting impeachment on cross-examination is to test the credibility of the witnesses. (*Collins*, 106 Ill. 2d at 269; *People v. Fonza* (1991), 217 Ill. App. 3d 883, 887, 578 N.E.2d 8.) However, a cross-examiner may not impeach a witness on a collateral matter but must accept the witness' answer. *Sandoval*, 135 Ill. 2d at 194; *Collins*, 106 Ill. 2d at 269; *Fonza*, 217 Ill. App. 3d at 887.

Whether a matter is collateral is determined by asking whether the matter could be introduced for any purpose other than to contradict. *Sandoval*, 135 Ill. 2d 159, 552 N.E.2d 726; *Collins*, 106 Ill. 2d at 269.

In *Collins*, the supreme court found no abuse of discretion when the trial court allowed the State to impeach the defendant's girl

friend who supported defendant's alibi that he was with her the night he was alleged to have been involved in three murders. She also gave detailed testimony that three days prior to the murders she and defendant went to see a kung fu movie at a certain theater. The State was allowed to call the manager of that theater to testify that there was no kung fu movie showing on that date. The rebuttal testimony was not collateral because it went to the witness' ability to recall activities during the week that the murders occurred. *Collins*, 106 Ill. 2d at 270.

In *Sandoval*, where the question before the jury was whether the defendant forced the complainant to have oral and anal sex against her will, the supreme court affirmed the trial court's finding that the issue of whether the complainant had dated anyone since the incident was collateral and offered for no other purpose than to contradict a statement of the complainant. The supreme court determined that such information would present the jury with no additional information about the charges against defendant. *Sandoval*, 135 Ill. 2d at 195. See also *People v. Stengel* (1991), 211 Ill. App. 3d 337, 349, 570 N.E.2d 391.

The question before the jury in this case is whether the defendant sexually assaulted and sexually abused D.S. While we affirmed the trial court's ruling to allow other crimes evidence relating to defendant's *modus operandi*, on this issue we find that Dr. Murphy's rebuttal testimony was not collateral because it provides evidence of both defendant's *modus operandi* and his common design or scheme.

Common design refers to a larger criminal scheme of which the crime charged is only a portion. (*Tipton*, 207 Ill. App. 3d at 696; *People v. Bryan* (1987), 159 Ill. App. 3d 46, 511 N.E.2d 1289.) Here, the State charges that defendant's scheme consisted of using his position as foster father, boys club founder and community minister to gain the confidence, friendship and respect of his young victims, then abusing that authority to coerce them into sexual acts for defendant's own gratification. We agree that the record provides adequate evidence to support this theory.

The evidence provided by Dr. Murphy on rebuttal arguably may go both to defendant's method of working and to a common design, since the rules in his household included tight restrictions on the boys' activities so that defendant's abuse was kept secret: a prohibition on using the telephone; a prohibition on leaving the home without an adult from the home; requiring the boys to come straight home from school; and apparently discouraging contact with family members or

adults outside the home who might somehow discover defendant's illicit activities.

Just as we have determined that defendant attempted to hide the abuse by restricting the boys' activities, sending the other boys to the boys club and asking one boy to stay home to answer the phone, we find his failure to provide medical examinations for the boys could be inferred as another method of subterfuge in avoiding possible exposure of his crimes. A physician might uncover in an examination, through routine questions and physical observations, that a patient is being abused or is otherwise under physical or mental stress, and inquire as to the cause.

Therefore, we find that the jury was presented additional information reasonably related to the charges against defendant by way of rebuttal testimony, and that the additional information may relate to defendant's *modus operandi* or his common scheme attempts to cover up the crimes.

For all of the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

CERDA, J., concurs.

JUSTICE RIZZI, dissenting:

After the original majority and dissenting opinions were filed, the defendant filed a petition for rehearing. The majority denied the petition for rehearing but has filed a replacement opinion entitled "Modified on Denial of Rehearing." Except for what I have to say in the following three paragraphs, I do not find anything in the Modified on Denial of Rehearing opinion that warrants comment other than what was contained in my dissenting opinion as originally filed.

In a footnote in the Modified on Denial of Rehearing opinion, the majority states that in two other cases I declined to reverse "by reason of lost evidence." In another footnote, the majority states that in my dissent I cited 31 cases where the State has either lost or destroyed evidence but that I neglected "to indicate that none, except *Hammock*, was reversed by reason of the loss or destruction by the State of such evidence." (235 Ill. App. 3d at 427 n.2.) These footnote references demonstrate what I believe is wrong with the majority's thinking. The majority does not see the existence of the problem, which is that the lost or destroyed evidence by

the State is not peculiar to this case but rather appears to be part of a pattern. If you do not see the problem, you cannot do anything about it—but the problem will continue!

Now that the majority has denied the petition for rehearing and filed its Modified on Denial of Rehearing opinion, the State will never explain what happened to the missing tape or tapes and another case will have been affirmed where the State has inexplicably not produced evidence in its possession. Unfortunately, the judiciary has established a pattern of condonation which leads to perpetuation of the problem; that itself is a problem. Pity the next accused who will be faced with the State inexplicably not producing evidence in its possession—and there surely will be others. In our adversarial criminal justice system, the State will continue to do that which it can get away with doing.

The remainder of my dissent remains as it was originally filed in response to the majority's opinion as originally filed.

I dissent because the trial judge erred in not either barring the testimony of K.H. or conducting an evidentiary hearing to determine what the State did with the tape or tapes of the two interviews that were taken of K.H. prior to trial. I would reverse and remand for a new trial.

This case bears the head of Janus. One face looks at the defendant and the other face looks at the prosecution, *i.e.*, the State. The face that looks at the defendant sees the acts which the defendant is accused of committing and the jury's verdict of guilty. The other face looks at the intolerable conduct of the State in having evidence inexplicably vanish in a case of this nature. This puts me in a position comparable to Odysseus between Scylla and Charybdis. Whichever direction I choose to look, I see something that agitates and alarms.

Unlike the majority, I choose to look in the direction of and assay the intolerable conduct of the State because that issue is so paramount that it transcends the case itself. This is plainly evident by the fact that the State's loss of evidence is not peculiar to this case; rather, it appears to be part of a pattern. The issue of the State[12] either losing or destroying evidence in its possession prior to trial has been raised on appeal in no fewer than the following cases:

---

[12]The State referred to here includes the police since they are part of the prosecutorial team.

*People v. Stevenson* (1990), 204 Ill. App. 3d 342, 562 N.E.2d 330 (baseball bat used in attack and victim's wallet recovered at the scene of the crime were lost); *People v. Lann* (1990), 194 Ill. App. 3d 623, 551 N.E.2d 276 (imitation police badge, bloodstained skullcap, bloodstained hammer and victim's wallet found in defendant's possession were destroyed); *People v. Everette* (1989), 187 Ill. App. 3d 1063, 543 N.E.2d 1040 (gun used in murder was destroyed by the State); *People v. Davis* (1981), 103 Ill. App. 3d 792 (defendant's briefcase and its contents were lost while in the State's possession); *People v. Nunn* (1989), 184 Ill. App. 3d 253, 541 N.E.2d 182 (audio tape of police officer's dictation of his notes was destroyed after the trial court ordered that the tapes be preserved); *People v. Young* (1991), 220 Ill. App. 3d 488, 581 N.E.2d 241 (confiscated controlled substance was destroyed); *People v. Stallings* (1991), 211 Ill. App. 3d 1032, 570 N.E.2d 820 (X rays and tissue samples necessary to support defendant's contention that victim's death was not caused by defendant's actions were destroyed prior to independent inspection and chemical analysis by defense counsel); *People v. Kidd* (1989), 180 Ill. App. 3d 1065, 536 N.E.2d 816 (gunshot residue test performed on another suspect was destroyed by police before it was tested or analyzed); *People v. Colley* (1988), 173 Ill. App. 3d 798, 528 N.E.2d 223 (bullet inventoried by police was lost prior to trial); *People v. Ambrose* (1988), 171 Ill. App. 3d 87, 525 N.E.2d 536 (tires recovered from stolen car were destroyed prior to defense counsel's inspection of the tires); *People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921 (State failed to preserve a tire and beer cans to test for defendant's fingerprints); *People v. Zayas* (1987), 159 Ill. App. 3d 554, 510 N.E.2d 1125 (gun used in murder was destroyed), *rev'd* (1989), 131 Ill. 2d 284, 546 N.E.2d 513; *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303, *rev'd* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355 (sole vaginal swab taken from deceased victim was destroyed during unilateral testing by State and therefore the swab was unavailable for independent analysis); *People v. Lucente* (1987), 116 Ill. 2d 133, 506 N.E.2d 1269 (police reports ordered to be produced by the trial court could not be located); *People v. Guest* (1986), 115 Ill. 2d 72, 503 N.E.2d 255 (bullet lost); *People v. Emrich* (1986), 113 Ill. 2d 343, 498 N.E.2d 1140 (State failed to properly preserve blood sample taken from defend-

ant prior to independent analysis by defense counsel); *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547 (photographs of defendant reenacting his encounter with victim lost); *People v. Madej* (1985), 106 Ill. 2d 201, 478 N.E.2d 392 (a prescription pill bottle bearing victim's name found in automobile driven by defendant lost); *People v. White* (1985), 134 Ill. App. 3d 262, 479 N.E.2d 1121 (supplemental police report prepared by arresting officer lost); *People v. Clark* (1984), 124 Ill. App. 3d 14, 463 N.E.2d 981 (State failed to preserve testing specimens taken from victim's vagina precluding independent chemical analysis by defense counsel); *People v. Hammock* (1984), 121 Ill. App. 3d 874, 460 N.E.2d 378 (State failed to produce a videotape of defendant's reenactment of a homicide); *People v. Smith* (1983), 114 Ill. App. 3d 1007, 449 N.E.2d 912 (relevant portions of the arresting officer's police report lost); *People v. Lopez* (1982), 107 Ill. App. 3d 792, 438 N.E.2d 504 (confiscated controlled substance was destroyed and unavailable for independent chemical analysis by defense counsel); *People v. Jones* (1991), 215 Ill. App. 3d 652, 575 N.E.2d 561 (confiscated money disappeared prior to trial); *People v. Lampkin* (1990), 193 Ill. App. 3d 570, 550 N.E.2d 278 (victim's blood samples were not properly preserved); *People v. Luallen* (1989), 188 Ill. App. 3d 862, 544 N.E.2d 1206 (videotape of defendant taken by police shortly after her arrest was lost); *People v. Ebener* (1987), 161 Ill. App. 3d 232, 514 N.E.2d 205 (after trial court ordered controlled substances preserved for independent chemical analysis by defense counsel, all confiscated controlled substance was consumed by police testing and unavailable for independent chemical analysis); *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592 (knife used in murder disappeared); *People v. Howard* (1985), 130 Ill. App. 3d 967, 474 N.E.2d 1345 (blood samples taken from the scene of murder were disposed of prior to independent analysis by defense counsel); *People v. Vargas* (1983), 116 Ill. App. 3d 787, 452 N.E.2d 736 (communication recordings were destroyed after the trial court ordered that the recordings be preserved).

All but seven of the cases cited were tried in Cook County.

As a member of the criminal justice system, I cannot help but be riveted with deep concern and anguish at what is happening. There appears to be a black hole somewhere in the State's evidence vault so condensed that evidence cannot be retrieved from its gravitational field.

I would not only reach a different result than the majority in this case, but I also disagree with other conclusions of the majority. Under the circumstances involved in this case, it behooves me to point out these differences.

Bearing in mind that there was no evidentiary hearing or verification as to what happened to the tape or tapes, I first note that the majority apparently assumes that the tape or tapes were lost in a good-faith measure merely because the prosecutors said in statements not under oath or verified that the tape or tapes cannot be found. It is as if the majority has misread the maxim *vox populi, vox Dei* to mean *vox prosequitur, vox Dei*. Of course, the correct maxim to be applied to statements made by the prosecutor is *vox, et praeterea nihil*.

Mere statements by a prosecutor that are not under oath or verified cannot suffice to establish what happened to evidence that was lost while in the State's possession since the prosecutor represents a party involved in an adversarial proceeding. When a person's liberty is hanging in the balance there is simply too much at stake to allow the State to lose evidence without verified detailed specifics as to what occurred.

I next address the following conclusion of the majority:

> "During pretrial investigation, K.H., who was serving in the Army in California, was contacted and interviewed twice by a Salinas, California, police officer in early February 1988. On those occasions, the officer surreptitiously tape-recorded the interviews. Based upon their conversations, the officer wrote a five-page summary of K.H.'s statements and sent the written report and tape to the Cook County sheriff's office in Chicago, which forwarded the evidence to the Cook County State's Attorney." (235 Ill. App. 3d at 423.)

I disagree with the majority's conclusion that the two interviews of K.H. that were conducted by Detective James Brown were on one tape. There is no evidence that the majority's conclusion is true, and Detective Brown's written report indicates otherwise. This further demonstrates why an evidentiary hearing is necessary in this case: We do not even know whether one or two tapes are missing.

In his written report, after referring to his first interview with K.H. on February 1, 1988, Detective Brown states: "My interview with K.H. was surreptitiously recorded utilizing a microcassette recorder. The original of that recording, along with a copy of this report, will be forwarded to Det. Farley." Finally, at the conclusion of his written report, Detective Brown states: "A copy of this report,

along with the tapes of the interviews conducted with K.H., will be forwarded to Det. Farley."

Surely, based on what Detective Brown wrote in his report, one can reasonably conclude that there were actually two tapes that are missing rather than one—but we don't know!

Two other aspects of the missing tape or tapes bear mention here. The first involves Detective Brown and the circumstances surrounding the taping of the interviews with K.H. The second is the plausibility of the prosecutors'[13] statements that they never heard the tape or tapes and one prosecutor's statement that "they were somehow lost in the transfer and change of personnel involved in the case."

Detective Brown's written report is the only document in the record relating to the tape or tapes. The report is dated February 3, 1988. According to the written report, on January 28, 1988, Detective Brown received a telephone call from Detective Robert Farley of the Illinois Cook County sheriff's office. The written report states that Detective Farley "is involved in the investigation of a major molestation case involving a Rev. Paul Hall."

According to the written report, in the telephone call Farley requested assistance in that "he needed K.H. contacted and an initial statement obtained." The written report provides that Detective Brown agreed to aid in the investigation and made arrangements to see K.H., and that he spoke with K.H. "in his patrol vehicle in less than ideal conditions." In his written report Detective Brown further states:

> "My interview with K.H. was surreptitiously recorded utilizing a microcassette recorder. The original of that recording, along with a copy of this report, will be forwarded to Detective Farley."

After the interview, Detective Brown arranged for a second interview with K.H. to take place on February 3, 1988. According to the written report, on February 2, 1988, Detective Brown spoke with Cook County Assistant State's Attorney Diane Romza. Romza is the same person who was one of the prosecuting attorneys in the defendant's trial.

According to the written report, Assistant State's Attorney Romza indicated to Detective Brown "the possibility of K.H. being flown back to the Chicago area for the purpose of being interviewed and/or giving

---

[13]There were two trial prosecutors: Ms. Diane Romza-Kutz and Mr. Michael Cahill. There were two trial attorneys for defendant: Mr. Patrick Tuite and Mr. Brent Stratton.

a statement before the grand jury." The written report also states that Romza asked Detective Brown to approach K.H. and make inquiry to see if he would be so amenable.

In addition, the written report states that when Detective Brown met K.H. on February 3, 1988, he transported him to the Salinas police department office. While en route, Detective Brown told K.H. about the possibility of his being requested to fly to the Chicago area to meet with Assistant State's Attorney Diane Romza, and K.H. agreed to comply with the request. Upon arrival at the Salinas police department office, Detective Brown telephoned Detective Farley and advised him of the conversation he had with K.H. Detective Farley then spoke with K.H. and obtained the necessary information to start the process to have K.H. released from military duty long enough to have him flown to Chicago to testify before the grand jury.

The written report further states that Detective Farley then asked Detective Brown to interview K.H. and "specifically cover some questions for the Illinois State Attorney, such as was K.H. shown any pornographic homosexual videos, was K.H. ever asked to wear women's clothing, that other persons were present in sexual three-somes with the reverend and what activity occurred in connection with the boys choir."

According to the written report, Detective Brown's second interview with K.H. was conducted in the detective interview room and was recorded. The written report also provides: "Based upon the advice of my Detective Captain, I limited the scope of my interview to those areas specifically requested that inquiry be made into by the Illinois State Attorney. This was done to limit my susceptibility to having to answer to a subpoena originating from the state of Illinois."

Detective Brown's written report also contains what one of the prosecuting trial attorneys described as a "synopsis" of the two interviews with K.H. The written report further states that the tapes of Detective Brown's interviews with K.H. were forwarded to Detective Farley. When Detective Brown sent the written report[14] to Detective Farley, he included the following note:

---

[14]The record is unclear as to whether the transmittal of the written report included the tape or tapes.

"2/3/88

Dear Bob,

Hope this is a help to you. If you need further help with this case from this end please call. Sounds like a great case—the kind legends are made from.

Take Care

/s/ James Brown"

In addition, with respect to Detective Brown's February 3, 1988, written report, on the first page it is stated:

"Person No. 1
K.H.

Person No. 2
FARLEY, ROBERT

Person No. 3
ROMZA, DIANE"

In the written report it is also stated that Detective Brown spoke with "Illinois State Attorney Romza" on February 2, 1988, and that Romza asked Detective Brown to ask K.H. if he would be willing to return to Chicago "for the purpose of being interviewed and/or giving a statement before the grand jury." The telephone conversation between Detective Brown and Assistant State's Attorney Romza took place the day after Detective Brown surreptitiously recorded the first interview with K.H.

At trial, when the nonproduction of the tapes was being discussed, the following colloquy occurred:

"MS. ROMZA-KUTZ: I think it's very important that I have never heard of the content of this one tape. It is not two tape recordings to my knowledge, according to Det. Farley, neither Mr. Cahill's. That tape was made without our knowledge during the investigation of Paul Hall.

It was, in fact, sent to Det. Farley of the Cook County Sheriff's Police, that was then turned over to an Assistant who was assigned to the case.

THE COURT: It is one office, State's Attorney's Office.

MS. ROMZA-KUTZ: I agree, Judge. However my understanding, the tape was presented to a police officer, so he is aware of the content of the tape as much as the State is.

THE COURT: Is it verbatim?

MS. ROMZA-KUTZ: No. I believe it would probably be a summary. I would be misleading the Court if I said it was verbatim. It's a very explicit point of the conversation.

At this time, Judge, we cannot present those tapes. We do not have them; we have not heard them. I cannot convey to the Court what the content, neither can the previous assistant that was assigned to the case."

It thus appears from the record that one of the prosecuting trial attorneys who was assigned to this case talked to Detective Brown about one of the two interviews that Detective Brown had with K.H. that was recorded on one of the tapes. Also, the first page of the written report bears the prosecutor's name. At trial, the prosecutor denied any knowledge of the tape or tapes. Under the circumstances, there should have been an evidentiary hearing as to what the "Assistant who was assigned to the case" did with the tape or tapes and what happened thereafter. I note that no logs relating to the deposit or withdrawal of the tapes from the State's Attorney's evidence vault appear in the record.

In addition, I disagree with the following conclusion of the majority:

"Similarly, although the trial court in the present case could only speculate on what the tape might contain, there is a strong likelihood that the officer's memorandum made contemporaneously with the tape is accurate since its author would not have known that the tape would not be available to compare against his five-page report." (235 Ill. App. 3d at 425.)

The statement that the officer's memorandum was made contemporaneously with the tape is not borne out by the record. Indeed, the record suggests that the tape was not used in preparing the report. In the trial court, the following colloquy occurred:

"THE COURT: Has either side made inquiry as to whether or not that report was made, or that report was prepared by the police department out there after they re-listened to the tape, or under what circumstances was the report prepared?

That seems to be the only remnant left of that interview.

MR. CAHILL: From my reading of the report, I did talk to the police officer, but it was my understanding that the report was prepared from the conversations. I don't think the actual—although I don't know, but it doesn't appear that the tape was used in preparing the report."

Moreover, Detective Brown's written report and his note to Detective Farley are telling. In his report he states proudly that he "surreptitiously" tape-recorded his interview with K.H. In his note he states: "Sounds like a great case—the kind legends are made from." To me, Detective Brown's actions are indicative of an overzealous law enforcement officer whose statements warrant doubt rather than believability.

Under the circumstances, I disagree with the majority's conclusion that "there is a strong likelihood" that Detective Brown's written synopsis is accurate.

In addition, the majority states: "[W]e believe that reversal is unwarranted by reason of this violation because *** (v) defense counsel never sought to interview the California police officer or take advantage of the opportunity to conduct a pretrial interview of K.H. on the day the trial started." (235 Ill. App. 3d at 432.) I have already discussed the fact that it is readily apparent that Detective Brown was an overzealous police officer in regards to this investigation, so it is unlikely that a pretrial interview without the benefit of the tape or tapes would have been revealing. This conclusion is buttressed by Detective Brown's own written statement in his report:

"Based upon the advice of my Detective Captain, I limited the scope of my interview to those areas specifically requested that inquiry be made into by the Illinois State Attorney. This was done to limit my susceptibility to have to answer to a subpoena originating from the state of Illinois."

With respect to defense counsel not taking "advantage" of the opportunity to interview K.H., the record reflects that the following occurred:

"MR. TUITE: Yes. As to a hearing, Mr. Stratton can be sworn and testify he did talk to K.H. and talked about the incident.

K.H. said, I have to talk to Ms. Romza, and when Mr. Stratton got back, then he said, no, I don't want to talk to you.

Now, I'm not again casting aspersions, but maybe you want a hearing as to why K.H., after talking to Ms. Romza, did not want to talk to the Defense.

But we did make an attempt to talk to him, on two occasions we talked, and so maybe he is lying, maybe he didn't talk to Ms. Romza, and using that as an excuse, maybe he did talk to Ms. Romza, and she gave him legal advice that he could talk or not talk as he wished.

But we made two attempts to talk to him. The first attempt was, I have to talk to Ms. Romza; the second attempt is, I talked to Ms. Romza. I don't want to talk to you.

So the initial interview becomes that much more important back in '88, because the police got to interview him. We don't get to interview him, and the record of that interview is only in a summary supposedly by a police officer that the tape is missing."

It is therefore plain from the record that there would have been no advantage to the defense to conduct a pretrial interview of K.H. on the day the trial started.

In addition, in view of the majority's discussion as to what defense counsel did not do with respect to the missing tape or tapes, it should be pointed out that defense counsel vigorously contested the State's contention as to the content of the tape or tapes and the whereabouts of the lost tape or tapes. Plainly, the record establishes that defense counsel assailed the representations of the prosecutors as to the State's failure to come forward with the tape or tapes. The following colloquy occurred at trial:

"MR. TUITE: We have basically outlined that to the Court before the recess, but perhaps the Court may want to hear from witnesses. But I think it is undisputed that K.H., whose testimony your Honor has said will be allowed in as proof of other crimes, was interviewed in January or February of 1988 out in California. The Salinas County Police were requested to find him with a Court Reporter and interview him with respect to any acts of sexual conduct between himself and Reverend Hall when he lived at Reverend Hall's house.

The report says that the interview was tape-recorded. The report further says that there was another interview February 3rd, and that was tape-recorded. Whether it was put on one tape, or two tapes were then reduced to one tape, we don't know. But we know from the report at least that there were two tape recorded interviews with K.H.

We know that under the law, we would be entitled to see those or hear those under discovery because it is probably even more appropriate than a summary of what we usually see in police reports, a summary of what the witness said. This is the exact words and voice of the witness.

That tape recorder, at least in the report, and I think it is not disputed, was sent by the Salinas County Police to Detective Farley of the Cook County Sheriff's Police here in Illinois, which was then given to an Assistant State's Attorney, whether it be Reginald Baker who had this case originally, or Mr. Derback, who was part of this case originally. But somebody had that tape recorder in their possession while being a member of the State's Attorney's staff.

Ms. Romza—and I have no doubt, no reason to doubt her word and I do not do so by comments—Mr. Cahill said, we don't know where it is at. We can't find it.

Well, it was obviously in their office. Somebody had it, and I would only venture to say that if I had a statement from a witness that I intend to put on as a Defense witness, and notified somebody I have a tape recorder—tape recorded statements of that witness, which I have to furnish under the discovery rules, before I put that witness on the stand, and I, at the eve of trial, said I can't find it, the inference would be—and I think the inference is—that it is damaging. The inference is that when you have a piece of evidence and you don't use it, the inference, whether it's a true inference or not, the inference is that it will be damaging to the side who didn't produce it."

It must also be borne in mind that the State itself considered K.H. to be an important witness at trial. The State therefore must have realized that the tape or tapes of his interviews were important to maintain and safeguard. This is demonstrated by the statement of the prosecutor at trial:

"MR. CAHILL: I think it's also very critical, Judge, Counsel indicated that K.H. is not a main witness, but I think that's quite to the contrary. I think he is a witness to David's incident of sexual abuse by Mr. Hall. Mr. K.H. was present when, I believe, two of the sexual encounters occurred between the Defendant, and I think he is an important witness. To argue that he is not an important witness, and is really collateral, and we can exclude him, Judge, I just don't think will hold water."

When as in this case the State does not produce evidence that was in its possession for safekeeping, we must be mindful that ours is an adversarial criminal justice system. The stark realities are such that what occurs with evidence when it is in the possession of the State prior to trial is not always what the unsophisticated would suspect.

Under the circumstances, it is obvious that this case has an issue that transcends the case itself and has an existence of its own. Where the State is involved in what has been described as "the investigation of a major molestation case" and it inexplicably cannot produce taped interviews of what the prosecutor himself described as "an important witness," and no evidentiary hearing or investigation is conducted as to what happened to the taped interviews, something is wrong with our criminal justice system. Moreover, when we take into account that the loss or destruction of evidence by the State is not peculiar to this case, an evidentiary hearing or an open investigation is vital. The integrity of our criminal justice system is at stake.

We, as judges, must therefore make it plain that there is no longer any room within the conscience of the criminal justice system in Illinois

for approving, condoning or making judicial sanctimonious admonitions that go unheeded when the State cannot produce evidence that was in its possession prior to trial. Trial judges should conduct a thorough evidentiary hearing in situations where the State fails to produce evidence in its possession. If no evidentiary hearing is conducted, testimony having a nexus to the missing evidence should be barred. Accused citizens with their precious liberty at stake are entitled to nothing less. Moreover, the past demonstrates that it is unrealistic to believe that any lesser judicial command will have any meaningful effect.

Accordingly, I would reverse the conviction and remand for a new trial consistent with what is stated herein.

